Wendy Lynn CARTER, Plaintiff,

v.

**Robert E. RUBIN, Secretary Department of the Treasury, Defendant.**

No. Civ. 93–1263 (RCL).

United States District Court, District of Columbia.

Jan. 28, 1998.

---

Jerusa Carl Wilson, Jr., Semmes, Bowan & Semmes, Washington, DC, James William Morrison, Arter & Hadden, Washington, DC, Thomas Gardiner Corcoran, Jr., Berliner, Corcoran & Rowe, Washington, DC, Michael Wayne Beasley, Falls Church, VA, for Plaintiff.

Stacy M. Ludwig, Alexander Shoaibi, United States Attorney's Office, Washington, DC, Sally M. Rider, Office of International Claims & Investment Disputes, Office of the Legal Adviser, Washington, DC, for Defendant.

*MEMORANDUM OPINION*

LAMBERTH, District Judge.

This matter comes before the court on defendant's motions to dismiss and for summary judgment on the discrimination claims of plaintiff Wendy Lynn Carter. Plaintiff Wendy Lynn Carter filed this suit after her resignation from the Bureau of Alcohol, Tobacco and Firearms ("ATF") contesting her working conditions, the threat of removal, and her subsequent resignation on the grounds that she was discriminated against on the basis of race (African–American), gender (female), and retaliation for participation in activities protected by federal anti-discrimination laws. Carter contends that she is therefore entitled to reinstatement to a federal law enforcement position, back-pay, and appropriate benefits under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and the Civil Rights Act of 1991, 42 U.S.C. § 1981.

The court is presented with defendant's motion to dismiss the portions of plaintiff's complaint that have not been administratively exhausted and defendant's motion for summary judgment on plaintiff's remaining claims. Upon consideration of the submissions of the parties and the relevant law, defendant's motion to dismiss certain portions of plaintiff's complaint is granted and defendant's motion for summary judgment on the remaining claims is likewise granted.

## I. *Background*

The Bureau of Alcohol, Tobacco, and Firearms ("ATF") is an agency of the United States Department of Treasury with a dual law enforcement and regulatory purpose. The ATF is charged with enforcing and administering firearms and explosives laws, as well as laws covering the production, use, and distribution of alcohol and tobacco products. The ATF's Office of Law Enforcement conducts its field operations through its approximately twenty-two district offices nationwide. Each of these district offices is headed by a special agent in charge ("SAC"), with subordinate offices in each district headed by group supervisors or resident agents in charge ("RAC's"). Def.'s Mot. for Summ.J. at 5.

In an effort to carry out its law enforcement mission, the ATF employs criminal investigators, also referred to as special agents, in the job classification series GS–1811.[1] The Bureau describes the duties of special agents as including gathering information and intelligence; investigating specific cases involving weapons, liquor, explosives, bombs, or component parts; participating in raids, surveillance activities, and working undercover; executing search and arrest warrants; assisting other law enforcement agencies; and reviewing evidence at the conclusion of an investigation and preparing case reports if evidence requires such a report. *Id.* at 5–6.

The position of a Criminal Investigator or Special Agent is classified by ATF as "critical sensitive." The establishment of a position's sensitivity level is based upon an analysis of the adverse impact to the agency that would result if an unsuitable person occupied that position. A position is designated as critical sensitive if there is potential for exceptionally grave damage to the national security if the position were held by an unsuitable person. Within ATF, all GS–1811 positions in the Office of Law Enforcement are designated as critical sensitive. *Id.* at 3.

The claims of discrimination asserted by plaintiff Wendy Lynn Carter stem, in part, from an incident immediately preceding her termination from her law enforcement position with ATF. Carter entered service with ATF on December 18, 1989 as a GS–1811, grade 5, Special Agent. Comp. ¶¶ 6, 43–45. In conjunction with her employment as an ATF Special Agent, Carter was issued a government-owned vehicle, law enforcement credentials, a 9mm Sig Sauer semi-automatic firearm and 9mm ammunition, and a .38 caliber Smith and Wesson Model 66 firearm and ammunition for this weapon. *Id.* ¶ 10. On

---

1. "GS–1811" is the Office of Personnel Management's ("OPM") classification number for special agents. All special agents in ATF are GS–1811s.

January 25, 1990, after qualifying in training to carry a firearm, Special Agent in Charge for the Washington Field Division David Troy ("SAC Troy") authorized Carter to carry a firearm on duty and to begin performing law enforcement functions. Carter then attended Criminal Investigator Training School from February 9, 1990 to April 11, 1990 and attended New Agent Training School from October 1990 to December 1990. *Id.* ¶¶ 11–12.

On February 16, 1991, Carter was involved in a dispute and altercation with her adult male friend, Joel Sadler. Def.'s Mot. for Summ.J. at 4. This dispute resulted in an automobile accident between plaintiff's government-owned vehicle and the vehicle that Sadler was operating and the firing of the government-issued Smith and Wesson revolver by Carter at Sadler. Comp. ¶ 31; Def.'s Mot. for Summ.J. at 9. Carter and Sadler had apparently argued earlier in the evening of February 16 with the argument resuming and escalating later that evening in Carter's suburban Maryland apartment.

Carter alleged that during the course of the altercation in her apartment she feared for her physical safety and as a result of this fear, she withdrew her government issued Sig Sauer 9mm pistol and demanded that Sadler cease his attack. Comp. ¶ 22. According to Carter, Sadler then grabbed the issued weapon, wrestled it from her and threw her over a living room couch. *Id.* ¶ 23. Sadler exited her residence with the Sig Sauer 9mm pistol in hand, and Carter pursued Sadler on foot as he attempted to leave her apartment complex in his vehicle. She proceeded to the parking lot to the location of her government-owned vehicle and retrieved her auxiliary government-issued firearm, a .38 caliber Smith and Wesson Model 66, and her bullet proof vest. *Id.* ¶ 28; Def.'s Mot. for Summ.J. at 8–9.

Once these items had been secured, Carter resumed her pursuit of Sadler, this time in her government-owned vehicle. While she maneuvered her vehicle in an effort to block Sadler's lane of traffic, Sadler approached Carter's vehicle at a high rate of speed with the headlights unilluminated. At this point, Carter claims to have been unable to determine whether Sadler was pointing the 9mm pistol at her while operating his vehicle. Comp. ¶ 29. Although Carter positioned her vehicle in a manner designed to prevent Sadler from leaving the apartment complex, he deviated from the road and maneuvered around Carter's vehicle. Carter fired a round from her government-issued Smith and Wesson pistol at Sadler's vehicle, but Sadler was unharmed. Comp. ¶ 30–31.

Carter continued her pursuit of Sadler on a public highway. While in pursuit, Sadler reversed his direction of travel by changing lanes and returned toward Carter. According to Carter, she then executed a vehicle blocking maneuver effectively blocking the route taken by Sadler and the vehicles collided. Comp. ¶ 33. She then contacted the duty agent at her post of duty, obtained back-up assistance, reported the event, requested intervention from local law enforcement officials, and finally returned to the scene. Howard County, Maryland police officials intervened and a Howard County police officer recovered Carter's government-issued Sig Sauer 9mm pistol from Sadler. Carter and the officials returned to Carter's apartment and were met by Carter's post of duty officer pursuant to her request. Comp. ¶¶ 34–35.

The Howard County Police Department report of this incident was dated February 17, 1991, and was subsequently included in the ATF Office of Internal Affairs Investigation Number 910090. The Howard County Police Department report presents a markedly different version of the events that occurred that evening when compared with Carter's depiction of the same events of that evening. The report presents Sadler's contention that during the course of the argument between Sadler and Carter at Carter's residence, Carter drew her Sig Sauer 9mm pistol and pointed the weapon at Sadler's head. After disarming Carter, Sadler stated that he was leaving Carter's residence and the apartment complex and told Carter that he would surrender the weapon to the Laurel Police Department. Def.'s Mot. for Summ.J. at 9. Antonio Hall, a friend of Sadler and a witness of the incident, confirmed this description of the events when interviewed by

the police. From this point, the police report largely coincides with Carter's version of the events. *Id.* at 10.

On February 17, 1991, ATF took into custody Carter's law enforcement credentials, stripped her of her arrest powers, and placed her on administrative duty thereby preventing Carter from engaging in her regularly scheduled activities as a GS–1811 Special Agent. Comp. ¶ 38. On this same date, the internal investigation of the incident was commenced. During the course of the investigation, Carter was interviewed by Joseph Dugan, an investigator from the Office of Internal Affairs ("OIA"), on two occasions but declined to provide Dugan with a signed affidavit detailing the incident. Def.'s Mot. for Summ.J. at 12.

As a result of the ATF's OIA investigation, SAC Troy, decided to terminate Carter's appointment as a criminal investigator with ATF. Comp. ¶ 42. After carefully considering the OIA report, SAC Troy concluded that Sadler had left plaintiff's apartment and was leaving the area of the apartment in his vehicle. SAC Troy assessed the totality of the circumstances, including the fact that Carter had already completed 14 months on the job, had attended both formal training schools given to new agents, and the manner in which she had reacted during the altercation and concluded that it was inappropriate for her to have fired her government-issued weapon at Sadler and that she had made a fundamentally flawed decision to use her firearm in that situation. Def.'s Mot. for Summ.J. at 12. SAC Troy indicated that he was not satisfied that the situation would change in the future or that he could rely on Carter to make an appropriate decision or take appropriate law enforcement actions in light of the incident. *Id.* at 12–13. Accordingly, SAC Troy determined that he could not continue to give Carter the responsibility and the authority of carrying a firearm and of deciding when to use and not to use a firearm and consequently, he decided to terminate Carter.

SAC Troy met with Carter on April 18, 1991 to discuss the conclusions that he had reached regarding the incident. At this meeting, Troy presented Carter with a letter which read in relevant part:

> On February 16, 1991, at approximately 11:00 p.m., you were involved in a dispute with an acquaintance, Mr. Joel Sadler, which occurred at your residence, and resulted in the discharge of your issued firearm and a vehicle accident involving your government automobile.

> Specifically, at the above date and time, this argument occurred inside your residence and resulted in your drawing your issued firearm, a Sig Sauer 9mm pistol, and pointing same at Mr. Sadler. He then disarmed you and left your residence in possession of this firearm. You then exited your residence and observed Mr. Sadler leaving the area in his vehicle. After failing to stop him by blocking the road with the government vehicle, you retrieved your second issue firearm, a Smith and Wesson Model 66 Revolver, and fired one round to the right of, and over, Mr. Sadler's vehicle.

> At this point you entered your government vehicle, a 1987 Chrysler Gran Fury, and pursued Mr. Sadler for a short distance from your residence where you eventually crossed into his lane of traffic as he was approaching you, resulting in a head-on collision between the two vehicles. You left the scene of this accident to call another ATF agent, then returned to find the Howard County, Maryland, police conducting an accident investigation. You ultimately returned to your residence and cleaned the Smith and Wesson revolver. In an interview with Office of Internal Affairs Special Agent Joseph E. Dugan on February 28, 1991, you admitted your firing of a warning shot was in violation of the ATF Order on firearms policy.

> Your actions as related above were not only in violation of Bureau Orders, but are considered as totally. unacceptable behavior and are an embarrassment to ATF. It cannot be tolerated as appropriate conduct for any Special Agent.

> Accordingly, based on the above, I am terminating your Schedule A appointment as a Criminal Investigator (Special Agent) GS–1811–7 effective April 19, 1991.

Comp. ¶ 43; Def.'s Mot. for Summ.J. at 13–14.

On April 19, 1991, SAC Troy informed Carter that he intended to remove her from her position as a Special Agent, but offered her the opportunity to resign. Carter attended this meeting with counsel and her father, and after consulting with both persons, she elected to resign in lieu of removal. Carter did resign from her position as a Special Agent with the ATF and specified that the resignation was to pursue other careers. Def.'s Mot. for Summ.J. at 14.

Carter claims that the internal investigation of the February 16, 1991 incident was a pretext employed by the ATF to mask "defendant's true unlawful discriminatory intent to terminate plaintiff's employment based on her sex and race." Comp. at ¶ 43. According to Carter, the ATF, "as part of the unlawful artifice to violate plaintiff's civil rights based on her race and sex, intentionally conducted, wrote up and officially issued its investigative report knowing that it contained false, deceptive, erroneous and misleading information for the purpose of justifying its illegal basis for its April 19, 1991 termination of plaintiff." Compl. ¶ 44.

As stated, Carter asserted that her termination resulted in large part from the investigation of the preceding events. However, Carter also claims to have been terminated in retaliation for her participation in a prior employment discrimination suit. Carter's claims of discrimination are based on her belief that ATF retaliated against her for participating in a class complaint of federal employment discrimination commencing in 1990. As Carter stated in her complaint "[p]art of defendant's basis for terminating plaintiff's employment on April 19, 1991 was unlawful retaliation, based on defendant's known involvement of plaintiff with the class of African–American special agents of BATF in the class action complaint, based on protected activity under Title VII." Compl. at ¶ 49.

On May 19, 1991, Carter contacted an EEO counselor and an interview between the counselor and Carter occurred on May 28, 1991. During that interview, Carter alleged that she had been discriminated against on the basis of her race and sex when she was forced to resign on April 19, 1991. Carter executed a Designation of Representative and Limited Power of Attorney, indicating that she was represented by Prather Randle, an attorney from Memphis, Tennessee, in connection with her pending complaint of discrimination. Def.'s Mot. for Summ.J.Ex. 1 at 17.

On June 24, 1991, Carter filed a formal complaint of discrimination with the agency alleging that she was discriminated against on the basis of her national origin and race. In her complaint, Carter made several assertions regarding the treatment she received during her employment as a Special Agent with ATF including claims that she failed to receive four evaluations she should have received during her first year of employment with the agency; that she had a discussion with her supervisors in October 1990 centering on alleged discriminatory comments, observations, and treatment by white agents toward Carter and African–Americans in general; and that in December Carter was told that she failed the Treasury Agents Exam, an examination that she claimed to be discriminatory. In this report, Carter also contended that she had been retaliated against because of her prior complaints of race discrimination to her supervisors and her participation in a class action filed in the United States District Court for the District of Columbia. On June 27, 1991, Carter clarified the bases for her complaint of discrimination. Carter supplanted her claims of national origin and race with claims of discrimination based on race and sex. *Id.* Ex. 1 at 11.

On July 12, 1991, the agency notified Carter's attorney in writing as to which issues were accepted by the agency for investigation. The agency defined the accepted issues as follows:

> Whether complainant was discriminated against because of her race (Black/Afro–American) and sex (female) when allegedly on April 19, 1991, she received a letter of termination, pertaining to·a February 1991 incident, and she subsequently resigned in lieu of having the termination action as part of her personnel record.

Whether Complainant was retaliated against for her prior involvement in the in the EEO process because she is involved in an [sic] Class Action Complaint which is pending in the U.S. District Court.

Def.'s Ex. 1 at 5.

The agency specified that the issues could be clarified if Carter disagreed with those accepted by the agency. No clarification was sought by either Carter or her counsel and no additional issues were raised administratively. The agency also notified counsel for Carter that it was rejecting other the allegations contained in her complaint. *Id.* Ex. 1 at 6–7. Specifically, the agency rejected Carter's allegations that "(1) she received one evaluation instead of four; (2) around October, 1990, she was involved in discussion around discriminatory comments, observations and treatment by white agents; and (3) in December, 1990, she was notified verbally that she did not past [sic] the Exam." *Id.* These issues were rejected because Carter failed to contact an EEO counselor within thirty days as required by 29 C.F.R. § 1613.214(a)(1)(I). Carter's counsel was informed by certified mail that this rejection constituted a final agency decision and was informed as to what Carter's appeal rights were regarding that decision. No action to appeal the rejected part of Carter's claim was taken by either Carter or her counsel.

The agency ultimately found no evidence of discrimination after its consideration of the accepted issues. After this determination was reached, Carter filed suit in this court.

## II. *Analysis*

### A. *Defendant's Motion to Dismiss*

### 1. *The Applicable Standard*

A district court should dismiss a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Hishon v. King Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). If, in evaluating dismissal under Rule 12(b)(6), a court must consider matters outside the pleadings and attached documents, the mo-

tion to dismiss for failure to state a claim will be construed as a motion for summary judgment. Fed.R.Civ.P. 12(b).

Federal Rule of Civil Procedure 56(c) permits a court to grant summary judgment when the evidence in the record shows that "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." The burden is on the moving party to show that there is no genuine issue of material fact or that the opposing party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party bears the ultimate burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When the moving party has carried its burden, the burden shifts to the nonmoving party to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed.R.Civ.P. 56(e)). All reasonable inferences must be drawn in the light most favorable to the non-moving party. The party bearing the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate by specific factual allegations, that a genuine issue of material fact remains for trial. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. A dispute about a material fact is genuine only if the evidence presented is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### 2. *Carter's Compliance with Title VII Time Limits*

■ A federal employee's exclusive remedy to challenge discriminatory practices in the federal government is section 717 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16. Section 717 was enacted as part of the Equal Opportunity Act 1972, Pub.L. No. 92–261, sec. 11, 86 Stat. 103, 111–12, and extends the protections contained in Title VII to federal government employees. This section also gives the EEOC broad authority to en-

force Title VII's antidiscrimination mandate within the federal government, "including responsibility for issuing regulations to control federal agencies' processing of discrimination complaints." *Bowden v. United States*, 106 F.3d 433, 437 (D.C.Cir.1997). Pursuant to that authority, the EEOC has established detailed procedures for the administrative resolution of discrimination complaints including a series of time limits for seeking informal adjustment of complaints, filing formal charges, and appealing agency decisions to the Commission.

■ Title VII and the regulations promulgated thereunder also establish suit-filing time limits. Under section 717(c), a complainant has the right to file a civil action either "[w]ithin 90 days of receipt of final action taken" by the employing agency, or if 180 days have passed since the filing of the complaint and the complainant is aggrieved by the agency's failure to take final action. If the complainant elects instead to appeal the agency's decision to the EEOC, the complainant once again has the right to proceed to court within 90 days of a final decision by the EEOC, or if the EEOC has taken no action, after 180 days have elapsed. 42 U.S.C. § 20000e–16(c); 29 C.F.R. § 1614(a–d). In essence, a federal complainant must file an administrative complaint concerning his or her allegations, and he or she may not file a civil action more than 90 days after receiving a final decision from either the employing agency or from the EEOC. *Id. See also Robbins v. Bentsen*, 41 F.3d 1195, 1197–98 (7th Cir.1994); *Charles v. Garrett*, 12 F.3d 870, 873–74 (9th Cir.1993). The limitations period for filing suit was extended from 30 to 90 days by the Civil Rights Act of 1991 and this extension became effective November 21, 1991. Pub.L. No. 102–166, sec. 114, 105 Stat. 1071, 1079.

■ Compliance with the filing requirements of Title VII is not a jurisdictional prerequisite, rather it is a condition precedent to suit that functions like a statute of limitations and is subject to waiver, estoppel, and equitable tolling. *Bowden*, 106 F.3d at 437. Equitable tolling is applicable to suits against private defendants as well as suits against the United States brought by federal employees. The propriety of equitable tolling must be determined on a case by case basis and may be appropriate where "the defendant has actively misled the plaintiff or where the plaintiff has in some extraordinary way been prevented from asserting his rights." *Carlile v. South Routt Sch. Dist. RE 3–J*, 652 F.2d 981, 985 (10th Cir.1981) (citation omitted).

In the instant case, it is abundantly clear that Carter failed to comply with the filing deadlines imposed by the statutory language of section 717 in filing her claim of discrimination with this court and she can claim no equitable basis to toll the applicable time limits. On June 24, 1991, Carter filed her initial complaint of discrimination with the agency. The agency rejected certain allegations contained in Carter's complaint pursuant to 29 C.F.R. §§ 214 and 1613.215 because Carter "failed to seek, notify or discuss [the allegations] with an EEO Counselor within 30 calendar days of the dates of the alleged discriminatory acts/actions." The rejected allegations included claims that she received an inadequate number of evaluations during her tenure as an employee of the Treasury Department; that she was involved in discussions containing discriminatory comments, observations and treatment by white agents in October 1991; and that she received verbal notification that she failed an allegedly discriminatory departmental exam in December 1990.

The agency letter containing the rejection of these claims submitted by Carter was delivered to her attorney via certified mail and contained the following admonition:

This letter constitutes the final agency decision of the Department of Treasury on the rejected portion of your client's complaint. I am accepting those issues of your client's complaint as set forth in the enclosed acceptance letter ... Your client's appeal rights are enclosed.

Def.'s Mot. to Dis.Ex. 1 at 6–7. As clearly stated, this letter constituted final agency action with respect to the rejected portions of Carter's complaint. Under the statute as it existed at that time, Carter was required to either appeal this determination or file a civil action within the applicable time limit. Car-

ter did neither. Instead, Carter included the rejected allegations in the civil action she filed in this court on June 11, 1993. As such, the portions of her complaint concerning allegations rejected by the agency in its June 12, 1991 letter to her attorney are time barred.

█ Nowhere does Carter assert that neither she nor her attorney received notification that certain portions of her complaint had been rejected by the agency. Instead, in her opposition to the motion to dismiss filed by defendant, Carter argues that "she was never personally aware of any such limitations by ATF in the scope of its EEO investigation, and that (her attorney) never conveyed any such limitations to her." Pl.'s Opp. to Def.'s Mot. for Summ.J. at 2. This argument is of no avail to Carter. It is undisputed that she signed a Designation and Limited Power of Attorney appointing attorney Prather Randle as her representative. Def.Ex. at 17. The rejection of her allegations were sent via certified mail to Randle on July 12, 1993. This constitutes sufficient notice to Carter so as to apprise her of the rejection of her claims and her appeal rights. As the Supreme Court has stated:

> [Section] 2000e–16(c) requires only that the . . . notification letter be "received;" it does not specify receipt by the claimant rather than by the claimant's designated representative . . . Under our system of representative litigation, "each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" *Link v. Wabash R. Co.,* 370 U.S. 626, 634, 82 S.Ct. 1386, 8 L.Ed.2d 734 (1962) (quoting *Smith v. Ayer,* 101 U.S. 320, 25 L.Ed. 955 (1879)) . . . To read the term "receipt" to mean only "actual receipt by the claimant" would render the practice of notification through counsel a meaningless exercise. If Congress intends to depart from the common and established practice of providing notification through counsel, it must do so expressly. *See Decker v. Anheuser–Busch,* 632 F.2d 1221, 1224 (5th Cir.1980).

*Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 92–93, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). Furthermore, the Supreme Court rejected any differentiation between receipt by the attorney and receipt by that attorney's office for purposes of section 2000e–16(c). *Id.* at 93, 111 S.Ct. 453. Receipt by Randle or his office effectively eliminates Carter's ability to claim that she failed to receive notice of the rejection of her claims.

Carter has failed to comply with the statutory time limits which are a condition precedent to filing a civil action regarding the portions of her complaint initially rejected by the agency. Additionally, she has failed to present any grounds necessitating a tolling of the applicable time limit. Accordingly, the portions of the complaint filed in this court stemming from the discrimination claims rejected by the agency are dismissed.

### B. Defendant's Motion for Summary Judgment

Defendant has moved for summary judgment on the remaining discrimination claims asserted by Carter, including her contention that she was forced to resign as a result of discrimination based on race and sex and in retaliation for her participation in activities protected under federal anti-discrimination laws. Defendant argues that summary judgment is appropriate with respect to these claims for the following reasons: (1) Carter's race and sex discrimination claims are precluded by res judicata and collateral estoppel by way of settlement of the prior class action lawsuit and (2) Special Agent in Charge David Troy's decision to terminate Carter's employment with ATF was based on legitimate, nondiscriminatory motives.

#### 1. The Class Action Settlement

##### a. Background of the Class Action Suit and the Terms of the Settlement Agreement

In 1996, this court entered its findings of fact and conclusions of law regarding class certification and settlement agreement in a class action lawsuit brought against the United States Department of Treasury's Bureau of Alcohol, Tobacco, and Firearms under Title VII. *Stewart v. Rubin,* 948 F.Supp. 1077 (D.D.C.1996), *aff'd* 124 F.3d 1309 (D.C.Cir.

1997). Plaintiffs at that time were fifteen current and former African–American GS–1811 series Special Agents and alleged class-wide racial discrimination and retaliation by ATF in a variety of personnel practices. These plaintiffs contended that ATF discriminated on the basis ʼof race in promotions, discipline, awards and assignments, special teams, Schedule A hiring,[2] hostile work environment, terminations, employment performance evaluations, training assignments, and retaliation against them for their equal opportunity activities. Plaintiffs sought widespread injunctive relief, retroactive promotions and tenure, back pay, compensatory damages, and attorneys' fees and costs.

The case was filed in this court in November 1990 on behalf of two African–American Special Agents, Larry D. Stewart and Mark Jones. Plaintiffs sought leave to file an Amended Complaint in January 1993, adding thirteen more named plaintiffs including Wendy Lynn Carter, plaintiff in the instant suit. This court granted the plaintiffs' motion and Carter became a named plaintiff in that class action suit.

In August 1994, this court referred the case to the District Court's Alternative Dispute Resolution program. Intensive settlement negotiations through the mediation process followed and the parties eventually reached a proposed Settlement Agreement. By order dated July 9, 1996, the court granted preliminary approval of the parties' settlement agreement. Pursuant to that order, ATF took measures designed to notify all class members and all current ATF Special Agents of the settlement agreement, the date that this court's fairness hearing would occur, and the deadline for filing objections to the proposed settlement agreement. This court finally approved this settlement in its November 21, 1996 opinion.

The agreement itself resolved all plaintiffs' claims and attorneys' fees and costs. The agreement further provided for individual monetary payments, set forth a procedure for providing individualized non-monetary equitable relief, provided for the development of a new promotion assessment system, and provided for additional equitable relief in the areas of performance appraisals, training, transfers, awards, bonuses, discipline, and assignments to special teams. These provisions established a mechanism for granting individualized, non-monetary relief to plaintiffs who had claims of discrimination on the basis of race in promotions, discipline, awards, assignments, details, terminations, performance evaluations, or training that were neither resolved nor dismissed between December 25, 1981 and the entry of judgment in the District Court. These plaintiffs were permitted to submit a claim under the procedures specified in the settlement agreement. According to the terms of the agreement, plaintiffs were bound to resolve their outstanding claims of discrimination based on race under the detailed administrative procedures set forth in the agreement.

Defendant contends that Carter's race and sex discrimination claims are precluded by either res judicata or collateral estoppel under the terms of the settlement agreement reached in the class action litigation. Def.'s Mot. for Summ.J. at 27. It is this court's conclusion that Carter's claims of discrimination based on race and retaliation are precluded by the terms if the settlement agreement. However, the agreement does not preclude Carter from pursuing her claims of discrimination based on gender.

b. *Claims of Discrimination Based on Race and Retaliation and the Settlement Agreement*

 The doctrines of res judicata and collateral estoppel are designed to "preclude parties from contesting matters that they have had a full and fair opportunity to litigate." *Montana v. United States,* 440 U.S. 147, 153–54, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979). These doctrines protect parties from

---

**2.** Pursuant to 5 C.F.R. §§ 6.1, 6.2, the office of Personnel Management ("OPM") has authorized ATF to hire a limited number of Special Agents under Schedule A. Schedule A positions are "[p]ositions other than those of a confidential or policy-determining character for which it is not practicable to examine." 5 C.F.R. § 6.2. Individuals hired under Schedule A do not have the same civil service protections as those hired on a career-conditional basis. The plaintiff in the instant case, Wendy Lynn Carter, was a Schedule A employee.

the expense and burdens associated with multiple lawsuits, conserve judicial resources, and reduce the possibility of inconsistent decisions. *United States v. Mendoza,* 464 U.S. 154, 158–59, 104 S.Ct. 568, 78 L.Ed.2d 379 (1984); *Bailey v. DiMario,* 925 F.Supp. 801, 810 (D.D.C.1995). Under res judicata, or claim preclusion, "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Collateral estoppel, or issue preclusion, similarly bars "relitigation of [an] issue in a suit on a different cause of action involving a party to the first case." *Id.* at 94, 101 S.Ct. 411; *Hardison v. Alexander,* 655 F.2d 1281, 1288 (D.C.Cir.1981); *Bailey,* 925 F.Supp. at 810.

Courts have distinguished between settlement agreements that have received final approval by courts and settlement agreements that have been voluntarily entered into by the parties without court approval. *Compare Bailey,* 925 F.Supp. at 810–11 (precluding claims that had also been the subject of a court approved class action settlement agreement because of res judicata) *with EEOC v. Peterson, Howell & Heather, Inc.,* 702 F.Supp. 1213, 1218 (D.Md.1989) (rejecting arguments of preclusion based on res judicata and collateral estoppel and stating "[d]efendants liken the settlement agreement to a consent decree, but the settlement agreement was not passed upon by any court. The settlement agreement was merely an extrajudicial agreement between a state agency and a private party.").

■■■ Similarly, when a party attempts to invoke claim or issue preclusion because a settlement agreement in place covers the particular claims at issue in a subsequent suit, courts look to the terms of the agreement to determine whether it evinces an intention by the parties to bar future litigation of some claims or issues. *See, e.g., Levinson v. United States,* 969 F.2d 260, 264 (7th Cir.1992). In *Levinson,* the Court of Appeals for the Seventh Circuit explained res judicata and collateral estoppel "do not apply where ... the issues or causes of action sought to be precluded in a subsequent pro-

ceeding were allegedly determined in a stipulation or a judgment by consent." *Id.* (quoting *Gall v. South Branch Nat'l Bank of South Dakota,* 783 F.2d 125, 127 (8th Cir. 1986)). *See also Kaspar Wire Works, Inc. v. Leco Engineering and Machine, Inc.,* 575 F.2d 530, 535 (5th Cir.1978). The court continued "[t]here is an exception to this general rule where the parties to a stipulation or consent judgment intended to foreclose an issue from future litigation." *Levinson,* 969 F.2d at 264. A settlement agreement not intended to release a claim or permanently resolve an issue implicitly forecloses the use of res judicata or collateral estoppel to bar future litigation of that claim or issue. Defendant's argument, therefore, must be examined in light of these considerations.

### i. *Carter's Race–Based Claims*

Defendant's motion for summary judgment specified that "plaintiff has failed to identify any unlawful actions which defendant allegedly took against her which are distinct from her claims which are part of and will be appropriately remedied by the class action settlement." Def.'s Mot. for Summ.J. at 29. Defendant correctly notes that "all claims regarding race discrimination and retaliation based on race were settled by the settlement agreement approved by this court on November 21, 1996," *id.* at 31, and continues "all counts regarding discrimination based on race and retaliation must be dismissed because they were part of the Settlement Agreement in the class action suit." *Id.* at 33.

Carter readily concedes that no claim of discrimination based on race is presently before this court. Indeed, her opposition to defendant's motion for summary judgment is replete with admissions that she is no longer pursuing claims of race discrimination in the instant case. *See, e.g.,* Pl.'s Opp. to Def.Mot. for Summ.J. at 5 ("Plaintiff has conceded on numerous occasions that her race discrimination claims were adjudicated by settlement in the *Stewart, et al.* action and that she is not pursuing, and legally cannot pursue, those race-based claims in this action."); *id.* ("[J]ust five months before Defendant filed his motion for summary judgment—defense

counsel . . . confirmed with Plaintiff's counsel James Wm. Morrison during the deposition of Plaintiff, on the record, that race claims were not at issue in this action."); *id.* at 6 ("Despite the record in this case that clearly reflects that race is not at issue in this case, Defendant inexplicably continues to maintain that this action involves race claims."). In light of Carter's own admissions and the terms of the settlement agreement, defendant's arguments on the issue of whether Carter's claims of race-based discrimination are precluded by the settlement agreement, res judicata, and collateral estoppel are moot.

### ii. *Carter's claim of Retaliation*

 Carter asserts that she has alleged a prima facie case of "gender-based discriminatory retaliation," Pl.'s Opp. to Def.'s Mot. for Summ.J. at 25, and suggests that paragraphs 46–51 of her complaint support this assertion. The paragraphs Carter references detail her allegations that:

> Part of defendant's basis for terminating plaintiff's employment on April 19, 1991 was unlawful retaliation, based on defendant's known involvement of plaintiff with the class of African–American special agents of BATF in the class action complaint, based on protected activity under Title VII, which was originally filed in early 1990 and subsequently filed a motion on January 15, 1993 seeking permission to file an amended and supplemental complaint.

Comp. ¶ 49.

Defendant contends Carter's claim that the discharge threatened by her supervisor and her subsequent resignation were in retaliation for her participation in activities protected under federal anti-discrimination laws should be precluded under the terms of the settlement agreement. Defendant's contention is correct.

**3.** Section 704(a) of Title VII is the primary source of protection against retaliation for those who oppose discrimination or participate in Title VII processes:
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment

 It is clear from the labeling of her claim of retaliation as one of "gender-based discriminatory retaliation" that Carter fundamentally misinterprets the nature of a claim of retaliatory discharge. Tile VII proscribes actions taken by an employer designed to discourage employees from exercising their rights under laws enacted in an effort to eliminate discrimination in the workplace.[3] Employers are prohibited from taking adverse employment action against an employee in retaliation for the employee's participation in activities covered in section 704(a) of Title VII. It is simply not possible for an employer to retaliate against an employee because of an employee's race or gender. This is not to say, however, that it is not possible for an employer to retaliate against an employee because of an employee's claim of race or sex discrimination. Indeed, this defines the essence of the statutory prohibition and is exactly what the statute contemplates.

It is by no means a stretch to conclude that Carter has intentionally mislabeled her retaliation claim in an effort to remove it from the confines of the settlement agreement which by its own terms covered all claims of race-based discrimination occurring between December 25, 1983 and the final entry of judgment in the district court on the agreement itself. Other than her participation in the class action lawsuit previously chronicled in this opinion, the record before this court is devoid of any evidence that she participated in any other action protected under Title VII before the events leading to her resignation. As her complaint specifically states, Comp. ¶¶ 46–51, her claim of retaliation rests solely on her participation in the class action suit.

For this reason, Carter must seek to resolve her claim of retaliation according to the terms of the settlement agreement. The settlement agreement approved by this court specifically states:

> . . . because he has opposed any practice made an unlawful practice by this (title), or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title].
> 42 U.S.C. § 2000e–3(a).

Defendant and ATF agree that no retaliation of any kind will be taken against any individual, including but not limited to the named plaintiffs, for his or her participation in the class or any other equal employment opportunity activity conducted during the period December 25, 1983 through the Entry of Judgment in the District Court . . .

The parties shall attempt in good faith to resolve any and all disputes concerning either the interpretation, application of or compliance with any provision in this Settlement Agreement without judicial intervention. An attempt at informal resolution and the following claims process shall be a prerequisite to either party's seeking relief from the Court for an alleged breach of any provision of this Settlement Agreement.

Def.'s Mot. for Summ.J.Ex. 23 at 34. The settlement agreement then proceeds to detail the process that should be employed if a dispute arises under the agreement.

Notwithstanding her claims to the contrary, Carter is bound by the terms of the agreement to resolve her claim of retaliation under the procedure set forth therein. The parties have manifested a clear intent to resolve matters that arose during the specified time period according to the terms of the settlement agreement.

### c. Carter's Claims of Gender Discrimination and the Settlement Agreement

■ Defendant asserts that Carter's claims of discrimination based on gender should also be precluded under the terms of the settlement agreement. According to defendant, Carter cannot differentiate between the alleged discriminatory actions which were taken against her because of her race and those taken against her because of her sex. Def.'s Mot. for Summ.J. at 27. Although defendant is correct in the assertion that both Carter's race–and gender–based claims stem from the events surrounding her termination in 1991,[4] the settlement agreement dealt explicitly with only the race–based claims that plaintiffs may have had.

In the opinion issued by this court approving the settlement agreement in *Stewart*, the court considered the arguments set forth by Special Agent Davenport, a female African–American special agent, pertaining to her efforts to opt-out of the settlement agreement. *Stewart*, 948 F.Supp. at 1089. Davenport suggested that she was not part of the class of plaintiffs covered by the settlement agreement because of her potential gender-based discrimination claims and claims under the Freedom of Information Act, 5 U.S.C. § 552. *Stewart*, 948 F.Supp. at 1089. In refusing to permit her to opt out of the settlement agreement, this court made it abundantly clear that she could pursue relief under the terms of the settlement agreement with no diminution of her right to pursue her gender and/or FOIA claims.

The instant case parallels the situation encountered by Davenport in her effort to opt out of the settlement agreement. The adoption of defendant's argument would place this court in the untenable position of imposing inconsistent standards upon two similarly situated plaintiffs. This the court will not do. Defendant has produced no evidence that the settlement agreement was not limited to claims of discrimination based on race or that the parties intended for the settlement agreement to encompass claims of gender discrimination. Therefore, Carter is not precluded from pursuing her claims of gender discrimination in the instant case.

### 2. Carter's Claims of Gender Discrimination

Defendant has moved for summary judgment on the claims of gender discrimination presented by Carter as well. Defendant contends that the adverse employment action

4. As stated, the agency investigating her complaint of discrimination accepted only two issues: (1) whether Carter was discriminated against because of her race and sex when she received the termination letter and subsequently resigned in lieu of having the termination action as part of her personnel record and (2) whether she was retaliated against for her participation in the class action lawsuit and her involvement in the EEO process. Def.'s Mot. for Summ.J.Ex. 13 at 8. She has failed to administratively exhaust any other complaint of discrimination she may now be presenting to the court and therefore, no other claims have been properly preserved.

experienced by Carter was a result of a legitimate, non-discriminatory reason and not due to discriminatory animus on the part of her supervisor. As will be demonstrated, since Carter cannot establish a prima facie case of discrimination, it is not necessary to consider defendant's proffered legitimate, non-discriminatory reason for the adverse employment determination. However, even if Carter established a prima facie case, this court concludes that defendant has not discriminated against Carter on the basis of her gender.

Section 703(a)(1) of Title VII of the Civil Rights Act of 1964 provides in relevant part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin....

42 U.S.C. § 2000e–2(a). The Supreme Court's opinion in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), established a three-part framework governing the order and allocation of proof in cases alleging discrimination under Title VII. The complainant must initially set forth a prima facie case of prohibited discrimination. *Id.* at 802, 93 S.Ct. 1817. Upon satisfaction of this requirement, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted," *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 255, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and "drops from the case." *Id.* at 255 n. 10, 101 S.Ct. 1089. The plaintiff then has the opportunity to demonstrate that "the proffered reason was not the true reason for the employment decision" and that the characteristic protected under Title VII was, in fact, the real reason for the employment action at issue. *Id.* at 256, 101 S.Ct. 1089. At all times throughout this burden shifting approach, the plaintiff retains the ultimate burden of persuasion. *Id.*

Under the third step of the *McDonnell Douglas* analysis, the plaintiff has the opportunity to submit evidence establishing that the employer's proffered reasons are merely a pretext for discrimination. The plaintiff must produce evidence from which a rational fact finder could infer that the employer intentionally discriminated against him or her on the basis of the protected trait. In order to meet this burden, the plaintiff must proffer "significantly probative," admissible evidence showing that the employer's articulated reason for his discharge was a pretext for discrimination. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The Supreme Court has defined pretext in this context as a showing that the employer's stated reason is false and that the real reason for the adverse employment decision is in fact discrimination. *Id.* at 515, 113 S.Ct. 2742.

### a. *Plaintiff's Prima Facie Case*

In a typical gender discrimination case, in which a female plaintiff has been terminated and accuses her employer of discriminating in favor of male employees, the plaintiff may establish a prima facie case by demonstrating: (1) that she is a member of a protected class; (2) that she was qualified for the position at the time of the termination; (3) she was terminated; and (4) after termination, her position was ultimately filled by someone outside of the protected class. *Hicks,* 509 U.S. at 506–508, 113 S.Ct. 2742; *Randall v. Howard University,* 941 F.Supp. 206, 210 (D.D.C.1996), *aff'd* 132 F.3d 1482 (D.C.Cir.1997). In essence, the plaintiff must establish by a preponderance of the evidence that she was terminated under circumstances giving rise to an inference of unlawful discrimination.

In the instant case, Carter is a member of a protected class as a female and was qualified for her position at the time of her termination. However, Carter is unable to satisfy the final prong required to establish a prima facie case. For this reason, summary judgment must be entered for defendant on

Carter's remaining gender discrimination claim.

■ This court is mindful of the fact that *McDonnell Douglas* does not require that the identical prima facie analysis be used in every discriminatory discharge case. As the Supreme Court has explained, the prima facie proof required by a plaintiff in a Title VII case may differ with each factual situation. *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). *See also Burdine,* 450 U.S. at 253–53 n. 6, 101 S.Ct. 1089 (indicating this standard is not inflexible, as "[t]he facts necessarily will vary in Title VII cases, and the specification . . . [of the prima facie proof required from plaintiff] is not necessarily applicable in every respect in differing factual situations.") (quoting *McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. 1817). All that the plaintiff must establish at the prima facie stage is that her discharge raised an inference of discrimination. The prima facie burden is not a heavy one, *Burdine,* 450 U.S. at 253–54, 101 S.Ct. 1089, and the proof need not be conclusive.

■ Carter may meet the requirements for a prima facie case of discrimination with respect to her termination by showing that either after her termination, she was replaced by a male or that had she been male, her employer would not have fired her. Carter must make some showing that the employer treated her and male employees in a disparate manner. *See, e.g., Simens v. Reno,* 960 F.Supp. 6, 8 (D.D.C.1997) ("[P]laintiff cannot make out a prima facie case of sex discrimination . . . [P]laintiff has failed to show that an employee not a member of her protected group (female) was promoted instead."); *Schwartz v. Paralyzed Veterans of America,* 930 F.Supp. 3, 9 (D.D.C.1996) ("Plaintiff might have attempted to plug [the] hole [in her prima facie case] by adducing proof that PVA hired someone less qualified as her successor, or that [her employer] treated women and men differently."). Carter has failed to meet either of these requirements.

This court has carefully perused the record and the arguments set forth by Carter in her complaint and her opposition to defendant's motions for dismissal and for summary judgment. The record is completely devoid of any evidence that a male replaced Carter after her resignation. In Carter's opposition to defendant's motion for summary judgment, the Report of Investigation, EEO Complaint of Wendy Carter TD No. 91–1151 included as defendant's exhibit 13 to defendant's motion for summary judgment and Carter's initial complaint are cited for the proposition that "[a]fter her discharge, Defendant sought a replacement for Plaintiff." Pl.'s Opp. to Def.'s Mot. for Summ.J. at 14. Neither these documents, nor any other documents submitted by either plaintiff or defendant, contain any evidence suggesting that Carter's former position was filled by a male. The record is simply silent on this issue.

■ Alternatively, the prima facie case required under *McDonnell Douglas* could be satisfied if Carter were able to demonstrate that similarly situated males were treated disparately. The District of Columbia Circuit has adopted the standard articulated in *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 802 (6th Cir.1994), in order to determine whether the plaintiff is similarly situated with another employee. *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507, 1514 (D.C.Cir.1995) (adopting the standard set forth in *Pierce* ). As the court stated in *Pierce* :

> In order for two or more employees to be considered similarly-situated for the purpose of creating an inference of disparate treatment in a Title VII case, the plaintiff must prove that all of the relevant aspects of [her] employment situation are "nearly identical" to those of the (male) employees who [she] alleges were treated more favorably. The similarity between the compared employees must exist in all relevant aspects of their respective employment circumstances.

40 F.3d at 802 (quotations and citations omitted).

· In her opposition to defendant's motion for summary judgment, Carter contends that the official that presented her with the option of termination or resignation, David Troy, im-

posed disciplinary measures upon her that were "more harsh and departed from discipline imposed on comparable incidents involving male off-duty agents." Contrary to her assertions, Carter has not provided sufficient evidence for a reasonable trier of fact to conclude that similarly situated males received more favorable treatment when involved in comparable circumstances.

In support of her contention that males have received more favorable treatment, Carter offers the affidavit of Vanessa McLemore, a GS–1811 Special Agent with ATF. This affidavit states "[b]ased on my experience in ATF, Agent Carter's situation was handled substantially different than that of male ATF Special Agents engaging in the same or similar conduct." Pl.'s Opp. to Def.'s Mot. for Summ.J.Ex. 11 at 8. This unsubstantiated declaration fails to reference any other agent specifically and therefore, can have no bearing on the issue before the court.

■ Carter also refers to an incident involving a white male agent from Roanoke, Virginia. This agent allegedly assaulted an informant and this incident was reported to the Washington Field Office. Carter points to the fact that this agent was not forced to resign as evidence of disparate treatment. Assuming that this version of events is true, the facts of this incident plainly indicate that this individual was not similarly situated when compared with Carter. At the very least, their situations can be distinguished on the basis that the incident resulting in Carter's resignation involved the discharge of her government-issued firearm. While the court is not attempting to minimize the gravity of an assault by a federal agent on a civilian, the actions resulting in Carter's resignation far exceed this gravity. Carter and this agent were clearly not similarly situated.

This court also conducted an *in camera* review of over seventy-five reports of incidents in which ATF Special Agents were investigated for violating ATF policy. In her memorandum of points and authorities filed in opposition to defendant's motion for summary judgment, Carter specifically references eight incidents which she claims demonstrate that similarly situated males have

received more lenient treatment when involved in situations requiring ATF to impose disciplinary measures. Pl.'s Stmt. of Mat. Fact at 6. This court's review of the reports referred to by Carter reveals that her reliance on these reports is misplaced and the reports would not permit a reasonable trier of fact to conclude that similarly situated males received more favorable treatment.

Seven of the eight incidents are sufficiently distinct factually to preclude Carter from arguing that she was similarly situated with those male agents. Incidents "# 18" and "# 68" can be distinguished from the facts of the instant case because neither of those incidents involved the discharge of a firearm. Although both of these incidents involved an inappropriate exhibition or display of an agent's firearm, neither agent discharged their weapon in the direction of another individual.

Incident "# 57" involved the accidental discharge of a shotgun in an agent's office. This court's review of the OIA investigative reports revealed that the accidental discharge of a firearm was by far the most investigated occurrence. It is disingenuous to suggest that Carter is similarly situated with agents who accidently discharged their firearms. While the possibility of severe injury exists in both situations, Carter made a conscious decision to fire her weapon at another individual. This is not the case when an agent accidently discharges their weapon.

Incident "# 54" concerned allegations that an agent failed to report the discharge of a firearm during an arrest. The SAC overseeing the OIA investigation ultimately concluded that "there [was] no evidence to indicate that [the agent] knowingly failed to report the discharge of a firearm during [an] arrest." ATF Investigative Report Dated September 18, 1989 (reviewed *in camera*). In this instance, not only can the allegation-failure to report discharge of a firearm-be distinguished from the instant case, but also the ultimate conclusion-no evidence to support the allegation-reveals that Carter was not similarly situated with this individual.

Incidents "# 24," "# 36," and "# 61" each involved incidents in which male agents be-

came intoxicated and fired their weapons. The reports of incidents "# 24" and "# 36" states that the Los Angeles Group Supervisor proposed a suspension of seven days after two male agents became intoxicated at a New Year's Eve party and fired one shot each from their government-issued firearm into a pile of dirt. The report of incident "# 61" states that the Los Angeles Group Supervisor proposed a suspension of three days after a male agent unlawfully discharged his government-issued weapon at an empty can lying on the ground three times within city limits. None of these indiscretions involve male agents firing their weapon directly at a civilian. This is a significant distinction. Carter directly and intentionally threatened the life of another individual and thus, it cannot be said that she was similarly situated to male agents investigated for discharging their weapons into an empty can or a pile of dirt.

Finally, Carter references incident "# 72" to support her theory that she was similarly situated to other male agents investigated for the discharge of their government-issued firearm. The report of this incident describes events that occurred during September 1991 in New Orleans, Louisiana, over six months after the events giving rise to the decision to terminate Carter. As a result of the investigation of this incident, the Deputy Assistant Director (Law Enforcement) of the New Orleans Field Office concluded that the male agent inappropriately discharged his firearm. In that case, an agent pursued a motorist who had failed to obey a traffic signal, collided with the agent's vehicle, and then fled the scene of the accident. During the pursuit of the motorist, the agent traveled past the motorist to avoid rear-ending the vehicle after the motorist had slammed on his brakes. The agent maneuvered his vehicle to block the motorist from escaping and exited his vehicle. Based on the reports of witnesses, the Deputy Assistant Director concluded that after exiting his vehicle, the agent began firing at the motorist as the motorist attempted to flee the scene. Although the agent was suspended for a period of five days for the inappropriate discharge of a firearm, this suspension was vacated after a polygraph examination revealed that

the agent perceived that he was in danger of loss of life or serious bodily injury.

A plaintiff attempting to demonstrate that she is similarly situated to a male employee is "required to prove that all of the relevant aspects of [her] employment situation were 'nearly identical' to those of the [male employee's] employment situation." *Pierce*, 40 F.3d at 802 (quoting *Ruth v. Children's Medical Center*, 940 F.2d 662 (Table), 1991 WL 151158, at *6 (6th Cir. Aug.8, 1991)). While factual similarities exist between Carter's case and incident "# 72," it is arguable whether it can be stated that their situations were nearly identical in all relevant aspects of their employment circumstances. As an initial matter, Carter and the agent involved in incident "# 72" were assigned to different field offices. Carter was assigned to the Washington District Office and the other agent was assigned to the ATF office in New Orleans. At a minimum, these agents had different supervisors and officials assigned to consider the OIA investigative report. Furthermore, in the instant case, Carter fired her weapon at an individual with whom she was acquainted and had been dating for approximately six months and as such, should have been better able to assess any perceived threat to her safety. Moreover, when Sadler left Carter's apartment and attempted to leave her apartment complex, the personal altercation between Carter and him had effectively ended. Carter was fully aware of where Sadler resided and the car that he was operating. At that time, she could have notified local authorities or requested assistance from other ATF agents. Instead, she chose to pursue Sadler by herself, draw her auxiliary weapon, position herself in the path of Sadler's vehicle, and fire a shot at Sadler as he attempted to leave the apartment complex. In sum, any danger or imminent threat encountered by Carter after Sadler departed from her apartment was simply a product of a series of flawed decisions made by her during that time.

In comparison, the vehicle operated by the agent involved in incident "# 72" was struck by an unknown motorist after the motorist disobeyed a traffic signal. This motorist proceeded to flee the scene of the accident and

failed to yield to the ATF agent even after the agent pursued the motorist with his law enforcement lights illuminated.

This court cannot conclude that the similarities between these situations establish by a preponderance of the evidence that SAC Troy reached the conclusion to terminate under circumstances giving rise to an inference of unlawful discrimination. While this court is cognizant of the fact that establishing a prima facie case of employment discrimination under the *McDonnell Douglas* framework is not particularly burdensome, Carter has failed to come forward with any evidence that she was either replaced by a male or that similarly situated males received more favorable treatment.

b. *Defendant's Legitimate, Nondiscriminatory Reason for the Adverse Employment Decision*

 Even if this court were to assume that Carter had met her burden of establishing a prima facie case of discrimination, defendant has proffered a legitimate, nondiscriminatory reason for the adverse employment action at issue. Carter was given the option of resigning or being terminated from her position as a Special Agent with ATF after a internal affairs investigation of the situation that occurred involving Carter and Sadler. SAC Troy made his decision to give Carter the option of resigning based on the OIA report of the February 16, 1991 events. This report contained the report of the Howard County police officers assigned to investigate the events and summaries of statements made by Carter and other individuals during the course of the OIA investigation.

As stated above, the report detailed the events of February 16, 1991 and Carter's use of her government-issued firearm and her government-owned vehicle during the course of these events. After reviewing the OIA report, SAC Troy concluded that Carter made a "fundamentally flawed decision to use her firearm in that situation." Def.'s Mot. for Summ.J. Ex. 15 at 90 (Deposition of David Troy). SAC Troy indicated that he believed that there was nothing that could be done to ensure him that Carter would be able to

make appropriate decisions in similar future situations. *Id.* at 91. By the time the events at issue occurred, Carter had participated in both of the formal training schools that are provided for new agents and SAC Troy believed that future training would not rectify the situation or restore his confidence in Carter's ability to respond appropriately if a similar situation arose in the future. *Id.* at 92. SAC Troy also stated that he had no reason to believe that the OIA report contained any inaccuracies.

This court is satisfied that defendant has produced a legitimate, nondiscriminatory reason for presenting Carter with the opportunity to resign or face the prospect of termination. The Bureau of Alcohol, Tobacco, and Firearms as an agency within the Department of the Treasury has traditionally functioned as a federal law enforcement agency with the responsibility of regulating and enforcing the use of firearms, explosives, tobacco, and alcohol products. ATF has a legitimate interest in maintaining public confidence and trust. *Cf. Willner v. Thornburgh*, 928 F.2d 1185, 1192 (D.C.Cir.1991) (recognizing this interest with respect to the Department of Justice, another federal law enforcement agency). Public confidence and trust in this organization would suffer if ATF were to employ individuals in whom supervisors failed to have complete confidence in their ability to exercise the proper judgment pertaining to the use and discharge of government-issued firearms.

In the instant case, Carter made a series of erroneous and fundamentally flawed decisions culminating in the discharge of her weapon. Her lapse of judgment is reflected not only in the discharge of this weapon, but also in her decision to pursue Sadler after the altercation ended in her apartment. Carter's own actions unilaterally escalated an incident that could have been more appropriately handled by local authorities.

 The burden that shifts to the defendant under the *McDonnell Douglas* burden shifting approach is merely to rebut the presumption of discrimination raised by the plaintiff by producing evidence that the plaintiff was terminated for a legitimate, non-

discriminatory reason. *Burdine*, 450 U.S. at 254, 101 S.Ct. 1089. The defendant is not required to persuade the court that it was actually motivated by the proffered reasons, but must merely raise a genuine issue of fact as to whether the defendant discriminated against the plaintiff. *Id.* In the instant case, the reason proffered by defendant has met this burden.

### c. *Plaintiff's Burden to Demonstrate Pretext*

Once the employer has articulated a legitimate, nondiscriminatory reason for the adverse employment action, the burden shifts to the plaintiff to demonstrate that the proffered reason was not the true reason for the employment decision at issue. *Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. At this point, the presumption of discrimination created by the plaintiff's prima facie case has been rebutted and plaintiff must now prove by a preponderance of the evidence that the reasons articulated by the defendant for the adverse employment action are merely a pretext for discrimination. *Hicks*, 509 U.S. at 515, 113 S.Ct. 2742. To show that the defendant's proffered reasons were pretextual, Carter must show "both that the reason was false, and that discrimination was the real reason." *Id.* Indeed, to survive defendant's motion for summary judgment, Carter must present sufficient evidence from which a jury could find that defendant's reasons are pretextual. Carter has not met this burden.

In this case, the record fails to reflect colorable evidence that, if believed, would allow a reasonable trier of fact to conclude that defendant discriminated against Carter on the basis of her gender. In her opposition to defendant's motion for summary judgment, Carter states that "Defendant's proffered reason [for the adverse employment determination] is false and retaliation is the real reason for the employer's action." Pl.'s Opp. to Def.'s Mot. for Summ.J. at 26. In support of this contention, Carter offers the deposition testimony and affidavits of herself and several other individuals employed by ATF. While much of the testimony offered by Carter summarily points to discrimination that she has allegedly experienced, it is sim-

ply insufficient and largely irrelevant to determining whether the decision to present Carter with the option of resigning or facing termination was a pretext for discrimination—that the decision offered was false and that discrimination was in fact the real reason for the adverse employment decision.

 In her deposition and affidavit, Carter makes several allegations that she received inferior training and an inappropriate number of evaluations during her tenure as a Special Agent with ATF. Pl.'s Mem. of Pts. and Auths. in Opp. to Def.'s Mot. for Summ.J. at 26 (citing Pl.'s Opp. to Def.'s Mot. for Summ.J. Ex. 2, 6, 10, 11, 13, and 19). Carter attempts to bolster these allegations with affidavits from co-workers who make broad allegations of gender discrimination within ATF. *Id.* Absent a greater degree of specificity, these allegations have no bearing on whether SEC Troy's decision to terminate Carter were a pretext for discrimination.

Notwithstanding Carter's claims to the contrary, these allegations fail to demonstrate that the action taken by SAC Troy in offering Carter the option to resign or face termination was a pretext for discrimination. These allegations fail to show that the stated reason for the adverse employment action at issue was not worthy of credence. *See Burdine*, 450 U.S. at 256, 101 S.Ct. 1089. Moreover, Carter's allegations without more are not sufficient to convince a reasonable trier of fact that intentional discrimination was the real reason for the adverse employment determination.

 Carter also asserts that SAC Troy's decision to terminate her was pretextual based on her allegations that the OIA report upon which SAC Troy based his determinations contained factual inaccuracies which she was not afforded an opportunity to correct. Inaccuracies within an internal investigation report could support an allegation of pretext in one of two ways: (1) by showing that the inaccuracies were so apparent that SAC Troy's conclusions were unreasonable based on the information contained in the report or (2) by showing that SAC Troy's reliance on the accuracy of OIA reports and the actual report at issue was unreasonable.

The deposition of SAC Troy states that he enjoyed exclusive authority in making the decision of whether to terminate Carter and this decision rested primarily on the OIA report issued after the investigation of the events of February 16, 1991 involving Carter. Pl.'s Mem. of Pts. and Auth. in Opp. to Def.'s Mot. for Summ.J. Ex. 6 at 79, 84–94. As stated, Carter contends that the report contained factual inaccuracies in its description of the events that led to SAC Troy's decision to terminate her and that she was never afforded an opportunity to correct these inaccuracies. *Id.* at 16 ("Plaintiff was not given a hearing or an opportunity to review or correct the factual inaccuracies in the investigation report before Troy terminated her employment."). Specifically, Carter states in her deposition that she never drew her 9mm Sig Sauer pistol in her apartment and pointed it at Sadler and that she never fired a warning shot at Sadler while he was in his vehicle and attempting to leave Carter's apartment complex.

Despite these allegations, Carter makes no showing that SAC Troy's reliance on the OIA report was unreasonable. The OIA made a complete and extensive investigation of the events giving rise to the decision to terminate Carter. The OIA report included a Report of Investigation and a Chronology of Investigation detailing the events. The report and chronology contained summaries of interviews of Carter, Sadler, officers of the Howard County Police Department, and Special Agents Michael McDuffy and Roy Cheeks, among others. Admittedly, the descriptions of the events provided by Sadler and Carter were contradictory. However, it is noteworthy that although Carter contests some of the statements made in the summary of her interview and the interview of Sadler, she failed to provide a written statement during the course of the investigation detailing the event.

Even if this court were to assume that Carter's description of the events as contained in her deposition and the affidavit she submitted in this case were true, this court is satisfied that it is not reasonable to conclude that SAC Troy's ultimate conclusion would have been altered. SAC Troy based his opinion on the totality of the circumstances and his conclusion that Carter made a fundamentally flawed decision to use her firearm. *Id.* Ex. 6 at 90. As SAC Troy stated in his deposition:

The IA report basically told me that Ms. Carter was in … an altercation with a male friend in her apartment, in some type of argument. That during the course of that argument this male friend disarmed her from her issue firearm.

And at that point, he vacated her premises and went to his car and attempted to leave the apartment complex where they were located. And that in doing so … the IA report told me that after he had left the apartment complex and gotten in his car and was attempting to leave the apartment complex, that Ms. Carter went to her government vehicle, retrieved her second issued firearm, a revolver. And proceeded to fire a round in the general direction of the vehicle as it was departing the apartment complex out the exit, going away from her, in other words …

And in my mind, I did not perceive … any threat to Ms. Carter at that point. The person was departing the premises and was leaving the area in his vehicle. And I felt that her decision to fire a round as the car was departing the premises to be completely unacceptable.

*Id.* Ex. 6 at 93. It is clear that SAC Troy's decision to terminate Carter did not rest on any one detail of the events that occurred. Rather, as SAC Troy indicated, it was a conclusion drawn from the totality of the circumstances and it is clear that this conclusion would not have been altered if the facts were as Carter contends.

Furthermore, the record fails to demonstrate that these reports are typically inaccurate or that SAC Troy should have reasonably known or suspected that the report in the instant case was in fact inaccurate in some material respect. Carter's deposition testimony recounts the meeting between Carter and SAC Troy at which SAC Troy read to Carter the reasons upon which he had based his decision to terminate her. *Id.* Ex. 2 at 230–233 (Carter deposition). Her version of events is devoid of any indication

that she communicated or attempted to communicate to SAC Troy that the letter detailing the reasons for termination based upon the OIA report contained inaccuracies. Carter has presented no evidence that SAC Troy's reliance upon the accuracy of the report was unreasonable or that his decision to terminate her was unreasonable in light of the contents of the OIA report.

Carter also contends that discriminatory intent can be established by comparing her punishment with discipline imposed on similarly situated males. This court has previously discussed the facts of the incidents cited by Carter to support this theory. The only incident arguably similar to the events giving rise to the decision to terminate Carter does not provide sufficient evidence to permit a reasonable finder of fact to conclude that discrimination was the true reason for SAC Troy's decision to terminate Carter. The agents were based in different offices-Carter in Washington and the other agent in New Orleans-and different supervisors proposed the discipline in each case. Moreover, the fact that the incident taking place in New Orleans occurred over six months *after* SAC Troy decided to terminate Carter clearly demonstrates SAC Troy could not have taken the discipline imposed on that agent into consideration when determining the proper discipline to be imposed on Carter. Carter has failed to make any showing that the decision to terminate her was inconsistent with any prior instances of discipline in substantially similar situations that could have been considered by SAC Troy in making his determination. Accordingly, Carter has failed to present sufficient evidence to permit a reasonable trier of fact to conclude that SAC Troy was motivated by a discriminatory intent in deciding to terminate her as a Special Agent.

The federal anti-discrimination laws do not entitle this court to sit as a "super-personnel department" that reexamines an agency's decision whether to terminate an employee. These laws serve the specific and narrow purpose of redressing discrimination based on certain, discreet classifications such as race, gender, or age. The sole concern of this court is whether the reason for which the defendant discharged Carter was discriminatory. In essence, when an employer articulates a reason for the termination of an employee not forbidden by law, this court is precluded from considering whether the reason was fair or correct, so long as it is the true reason for the discharge. This is particularly true where a law enforcement agency terminates an employee based on the conclusion that this employee is incapable of carrying out the mandate of that agency. While no greater degree of deference is or should be afforded to employment decisions made by such entities, courts must remain acutely aware of their role in such cases. Indeed, this court will not permit plaintiffs to use Title VII as a sword rather than as a shield in an effort undercut legitimate decisions made by employers.

### III. *Conclusion*

For these reasons, defendant's motion to dismiss certain portions of plaintiff's complaint is granted and defendant's motion for summary judgment on the remaining claims is granted.

A separate order shall issue this date.

### *ORDER*

For the reasons stated in the accompanying memorandum opinion, it is hereby

ORDERED that defendant's motion to dismiss is GRANTED and paragraphs 9, 13, 14, 15, 16 and 17 of plaintiff's complaint are hereby DISMISSED; it is further

ORDERED that defendant's motion for summary judgment on plaintiff's remaining claims is GRANTED and plaintiff's complaint is hereby DISMISSED.

SO ORDERED.