Ellen WATERHOUSE, Plaintiff,

v.

DISTRICT OF COLUMBIA,
et al., Defendants.

No. CIV. A. 99CV0241 (ECH).

United States District Court,
District of Columbia.

Dec. 13, 2000.

Morris Kletskin, Mark Crawford, Friedlander, Misler, Friedlander, Sloan & Hertz, PLLC, Washington, DC, for Plaintiffs.

Mary E. Pivec, Damien G. Stewart, Greenberg Traurig, LLP, Washington, DC, for Defendants.

### MEMORANDUM OPINION

HUVELLE, District Judge.

Plaintiff, a white female, was employed as the Chief Financial Officer ("CFO") of the District of Columbia Government's Department of Administrative Services ("DAS") from February 1997 through January 1998. She was terminated by the District of Columbia, Office of the Chief Financial Officer ("CFO"), on January 16, 1998. Plaintiff has filed suit against the District of Columbia and Mayor Anthony Williams, who was at the time the Chief Financial Officer ("CFO") of the District of Columbia, alleging disparate treatment, discriminatory discharge and a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Defendants have moved for summary judgment on the grounds that plaintiff has failed to present sufficient facts to permit a reasonable jury to conclude that plaintiff was the victim of race discrimination or subjected to a racially hostile work environment. As explained more fully below, the Court concludes that defendants' motion should be granted.

### BACKGROUND

Plaintiff was employed by the IRS in late 1996, when she submitted a resume to the District of Columbia Office of the Chief Financial Officer. She was interviewed by Anthony Williams and several of his senior staff, including Earl Cabbell, Deputy CFO

for Finance and Operational Systems ("OFFS"); Norman Dong, Chief of Staff; Laura Triggs, Associate Chief Financial Officer; and Max Brown, General Counsel to the CFO. Cabbell and Williams are African–American, Dong is Asian–American, and Triggs and Brown are Caucasian. Ultimately, plaintiff was offered and accepted the position of CFO of the District of Columbia Department of Administrative Services ("DAS") at an annual salary of $97,000. Plaintiff began working in this position in February 1997. She reported to Williams through his senior staff, Triggs, who supervised agency CFO's on technical and financial issues, and Dong, who supervised on operational and administrative issues.

The function of DAS is to provide procurement and accounts payable services to other District agencies with respect to facility leasing, security, custodial services, utility and telecommunications services. Plaintiff, as CFO, was responsible for supervising the day-to-day activities of the DAS Financial Office, including management of the general ledger through the accounts receivable and accounts payable functions. Additionally, plaintiff was responsible for developing and implementing a strategic operating plan for addressing the longstanding financial problems of the agency, overseeing the preparation of the annual budget for DAS, and managing year-end closing activities for DAS accounts.

As discussed more extensively below, soon after plaintiff was hired, defendants developed serious concerns regarding her performance. In particular, defendants perceived deficiencies in plaintiff's ability to build a financial team, to submit required reports to her supervisors, to pay outside vendors in a timely fashion, and to complete the FY 1999 budget submission and the FY 1997 closing process.

As a result, Dong and Triggs recommended to Williams that plaintiff be terminated. Cabbell requested that the termination be delayed until January so as not to compromise the audit. Williams accepted both recommendations. On January 16, 1998, Triggs informed plaintiff that she would be terminated for her inadequate performance unless she voluntarily resigned or accepted a revenue accountant position in the Office of Tax and Revenue. Plaintiff rejected both alternatives and was terminated effective January 16, 1998.

Plaintiff filed an EEOC discrimination complaint, was subsequently issued a right to sue letter, and filed this suit on February 3, 1999. In Count I, plaintiff contends that she suffered disparate treatment on the basis of her race in that she was discriminatorily discharged and was given less time, resources, and support to carry out her responsibilities than was provided to her African–American counterparts. In Count II, plaintiff claims, based on the same factual allegations that underlie Count I, that she was subject to a hostile working environment on account of her race.

The question raised by this summary judgment motion is whether defendants violated plaintiff's rights by subjecting her to disparate treatment and by discharging her because of her race. Since plaintiff has not opposed defendants' motion with respect to Count II, which alleges a hostile work environment, the Court finds that the motion is conceded as to that count.[1] With respect to Count I, the issue is whether plaintiff's termination was a result of discrimination, *i.e.* whether defendants' criticisms of her performance were false or pretextual and whether she was treated less favorably than similarly situated African Americans. In deciding this issue, the Court need not decide whether plaintiff was qualified for the position of CFO of DAS or whether plaintiff had strengths or

---

1. The factual basis for this count includes claims of disparate resources and discriminatory discharge. These issues are therefore subsumed within the Court's analysis of Count I.

successes in her position.[2] Rather, the Court need only decide whether plaintiff has raised an issue of fact regarding the legitimacy of defendants' reasons for termination.

## LEGAL ANALYSIS

### I. Summary Judgment Standard

Under Fed.R.Civ.P. 56, a motion for summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255, 106 S.Ct. 2505; *see also Washington Post Co. v. United States Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C.Cir.1989).

The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-moving party must provide evidence that would permit a reasonable jury to find in the non-moving party's favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C.Cir.1987). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505 (citations omitted). "While summary judgment must be approached with special caution in discrimination cases . . . a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, 1998 WL 164780 at *3 (D.D.C. March 31, 1998), *aff'd*, 1999 WL 825425 (D.C.Cir. Sept.27, 1999) (citation omitted). In addition, Local Civil Rule 7.1(h) provides that "[a]n opposition to such a motion shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated, which shall include references to the part of the record relied on to support the statement."

Despite these principles of law and the requirements of the local rules, plaintiff has filed an affidavit entitled "Verified Statement of Material Facts as to Which the Plaintiff Contends There Exists a Genuine Dispute," in which there are many assertions as to which she has no firsthand knowledge. The affidavit is also deficient insofar as reference is made to alleged facts for which no record citation is provided or a deposition is cited without any specific page references.[3] The burden is on the parties, not on the court, to "identify the pertinent parts of the record, to isolate the facts that are deemed to be material, and to distinguish those facts which are disputed from those that are undisputed." *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C.Cir.1988), *cert. denied*, 490 U.S. 1066, 109 S.Ct. 2066, 104 L.Ed.2d 631 (1989); *see also Jackson v. Finnegan, Henderson, Farabow, Garrett, & Dunner*, 101 F.3d 145, 153 (D.C.Cir.1996) (noting the burden is on counsel, not the court, to "winnow the wheat from the chaff").

Plaintiff's verified statement also fails to dispute many of the facts set forth by defendants concerning plaintiff's alleged

---

2. *See Hardy v. Marriott*, 670 F.Supp. 385, 391 (D.D.C.1987) ("Plaintiff's strengths, however, do not create an inference that his discharge was racially motivated given the long list of problems plaguing his job performance.").

3. Plaintiff's verified statement also contains argument and analysis from plaintiff's opposition which does not belong in a Rule 7.1(h) statement of disputed facts.

failure to perform her work satisfactorily.[4] Under Rule 7.1(h), "the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." Moreover, as discussed below, plaintiff's self-serving statements as to her competence or her superior performance do not serve to raise material issues of fact regarding defendants' proffered reasons for plaintiff's termination. Therefore, the Court will treat as conceded all facts not specifically controverted by competent evidence.

## II. Prima Facie Case of Discrimination

 To establish a prima facie case of discriminatory discharge, plaintiff ordinarily must show that (1) she belongs to a protected class, (2) that she performed at or near the level legitimately expected by her employer, (3) that she was discharged, and (4) that she was replaced by a person outside the protected class or that similarly situated individuals outside the protected class were retained. *Kidane v. Northwest Airlines, Inc.*, 41 F.Supp.2d 12, 17 (D.D.C.1999); *Carter v. Rubin*, 14 F.Supp.2d 22 (D.D.C.1998). The prima facie test is a "flexible" one that may be adjusted to the facts of the case at hand, guided by the necessity of a showing that the employment action was taken "under circumstances that give rise to an inference of discrimination." *Harding v. Gray*, 9 F.3d 150, 152 (D.C.Cir.1993).[5]

4. Plaintiff has not disputed paragraphs 1, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 33, 34, 35, 36, 39, 40, 41, and 43 of defendants' statement of undisputed facts. In other paragraphs, plaintiff has disputed certain facts but not others.

5. Because this case alleges "reverse discrimination," plaintiff has the burden at the prima facie stage not of showing that she belongs to a protected class, but of demonstrating additional "background circumstances that support the suspicion that the defendant is the unusual employer that discriminates against the majority." *Harding*, 9 F.3d at 152, 153 (citation omitted) ("Invidious discrimination

] In order to demonstrate a prima facie case of disparate treatment, plaintiff must show (1) that defendants treated African–American CFO's differently than white CFO's, and (2) that the African–Americans who received different treatment were similarly situated to plaintiff. *See Batson v. Powell*, 21 F.Supp.2d 56, 58 (D.D.C.1998), *aff'd without op.*, 203 F.3d 51 (D.C.Cir.1999) (setting forth test in context of Title VII gender discrimination claim). "In order to prove disparate treatment, plaintiff must produce evidence which establishes that for the same conduct [s]he was treated differently than similarly situated employees outside [the] protected class." *Kidane*, 41 F.Supp.2d at 17 n. 8. "A plaintiff must ... demonstrate that all of the relevant aspects of her employment situation were nearly identical to those" of the employee being compared. *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C.Cir.1999) (citation omitted); *see also Mungin v. Katten Muchin · & Zavis*, 116 F.3d 1549 (D.C.Cir.1997).

## III. Burden Shifting Analysis

In a case such as this one, where the plaintiff cannot produce direct evidence of discriminatory or retaliatory animus, the three-part "shifting burdens" test established by *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is applicable.

First, the plaintiff has the initial burden of proving by the preponderance of the

against whites is relatively uncommon in our society, and so there is nothing inherently suspicious in an employer's decision to promote a qualified minority applicant instead of a qualified white applicant."). This burden can be satisfied by evidence that a particular employer had a reason or inclination to discriminate invidiously against whites, or evidence "indicating that there is something 'fishy' about the facts of the case at hand the raises an inference of [reverse] discrimination." *Id.* at 153 (citations omitted). Because defendants have not addressed or challenged plaintiff's satisfaction of this element, the Court will assume that it is not contested.

evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden then shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." [*McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817]. Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a mere pretext for discrimination.

*Id.* at 804, 93 S.Ct. 1817. *See also Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the defendant has proffered non-discriminatory reasons for termination, the plaintiff must show "both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

This test was recently explicated by the Supreme Court in *Reeves v. Sanderson Plumbing Products Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), where the Court held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Id.* at 2109. In other words, "it is permissible to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* The Court also noted that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational fact finder could conclude that the action was discriminatory." *Id. See also Schnabel v. Abramson,* 232 F.3d 83, 2000

WL 1676601 (2nd Cir. Nov.8, 2000) (affirming summary judgment post-*Reeves* where plaintiff established prima facie case and set forth some evidence of pretext, but presented no evidence from which a reasonable trier of fact could infer discrimination). The Court concluded that "[w]hether judgment as a matter of law is appropriate in any case will depend on a number of factors," including "the strength of the prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case." *Reeves,* 120 S.Ct. at 2109.

In particular, with respect to a defendant's claim that plaintiff's performance was deficient, " '[i]t is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. [Sh]e must show that the explanation given is a phony reason.' " *Fischbach v. D.C. Dep't of Corrections,* 86 F.3d 1180, 1183 (D.C.Cir.1996) (citing and quoting *Pignato v. American Trans Air, Inc.,* 14 F.3d 342, 349 (7th Cir.1994)). "Filing a Title VII action ... is meant to shield employees from the discriminatory actions of their employers, not to excuse an employee's poor job performance, impudence, or insubordination." *Gregg v. Hay–Adams Hotel,* 942 F.Supp. 1, 9–10 (D.D.C.1996). Therefore, a district judge does not sit as a " 'super-personnel department that reexamines an entity's business decisions.' " *Fischbach,* 86 F.3d at 1183 (citing and quoting *Dale v. Chicago Tribune Co.,* 797 F.2d 458, 464 (7th Cir.1986)).

### *FACTUAL ANALYSIS*

### I. Discriminatory Discharge

■ Defendants contend that plaintiff failed to perform her job at an acceptable level and therefore she cannot satisfy the second prong of the prima facie test.[6]

---

**6.** Defendants also argue that plaintiff has failed to establish the second prong of a prima facie case in that plaintiff was not qualified to be hired for the position she occupied.

Since defendants did hire plaintiff, and Cabbell and Williams both testified she was qualified to be offered the position, the Court finds little basis for crediting this argument.

However, "inadequate performance is also defendants' proffered basis for terminating plaintiff." *Dang v. Inn at Foggy Bottom*, 85 F.Supp.2d 39, 43 (D.D.C.2000). Therefore, "the Court will assume that a prima facie case is established and proceed to analyze whether plaintiff has demonstrated that defendant[s'] proffered reason is a pretext for discrimination." *Id.*[7]

Defendants argue that they had a legitimate nondiscriminatory reason to terminate plaintiff due to her poor performance. In particular, defendants fault plaintiff for deficiencies involving 1) the delayed submission of an agency budget and year-end closing packages; 2) the untimely payment of vendor bills which caused vendors and various public officials to voice complaints about plaintiff's performance; 3) the inefficiency with which she evaluated her staff and filled key positions; and 4) a lack of communication with her supervisors, including the failure to submit monthly progress reports and Financial Status Reports, and to respond to Triggs' requests for information. While plaintiff responds, by relying on her own self-serving affidavit, that she was qualified and performed in a competent manner, she does not dispute many, if not most, of the facts on which defendants rely to support their termination decision.[8] Because most of the material facts as to each of the reasons for plaintiff's termination cited by defendants remain unrebutted, plaintiff has failed to offer evidence upon which a reasonable jury could conclude that these reasons were not the true reasons, but were false or pretextual.

Plaintiff cannot establish pretext simply based on her own subjective assessment of her own performance, for "plaintiff's perception of h[er]self, and of h[er] work performance, is not relevant. It is the perception of the decisionmaker which is relevant." *Smith v. Chamber of Commerce of the United States*, 645 F.Supp. 604, 608 (D.D.C.1986); *see also Hastie v. Henderson*, 121 F.Supp.2d 72, 81 (D.D.C. 2000) (finding no genuine issue of material fact where plaintiff provided no evidence "other than her own self-serving and conclusory statement that she completed more work than Brownell—which would permit this Court to conclude that defendant's reason for giving Brownell rather than plaintiff an '[o]utstanding' rating is pretextual"); *Amiri v. District of Columbia*, 1989 WL 37155 at *3 (D.D.C. March 21, 1989) ("[Plaintiff] concluded in his own mind that ethnic or national origin discrimination must have been the basis for his failure to be selected and so testified. These self-serving declarations are not credited."); *Saunders v. DiMario*, 1998 WL 525798 at *4 (D.D.C. August 14, 1998) ("Plaintiff has otherwise offered the type of self-serving allegations that are simply insufficient to establish pretext."). Applying the principles recognized by these cases here, it is clear that plaintiff's argument that, in her opinion, she was competent and performed well in her position, that her performance problems were not as serious as described by defendants,

---

7. Although both plaintiff and defendants concentrate on whether similarly situated African American managers were retained in their positions, it is undisputed that plaintiff was ultimately replaced by an African–American female, Barbara Jumpers (Def.St.¶ 38). She therefore has satisfied the fourth prong of a prima facie case of discriminatory discharge.

8. Defendants claim that plaintiff had problems constructing her strategic operating plan, that Mr. Dong dispatched OCFO personnel to assist her in preparing her plan, assistance that other agency CFO's did not require, and that her plan was minimally satisfactory. (Def.St.¶ 7.) Plaintiff disputes this, claiming that she submitted her operating plan shortly after commencement of her employment, without the assistance of Mr. Dong or any of his junior staff members, and that the plan was approved by the OCFO. (Pl. St. at 2.) She contends that the priorities set forth in the operating plan were consistent with the long range and short term goals of the Control Board and Chief Financial Officer. This dispute is not material, as neither plaintiff nor defendants assert that the preparation of the strategic operating plan had anything to do with plaintiff's termination.

that they were outweighed by her successes, or that they did not justify her termination is simply not relevant nor sufficient to raise an inference of pretext.

Moreover, plaintiff's quibbles with the defendants' reasons and her proffered justifications and explanations for her shortcomings do not suffice to establish pretext, for "plaintiff must do more than just deny or criticize the proffered reasons of the defendant[s]." *Vasilevsky v. Reno*, 31 F.Supp.2d 143, 149 (D.D.C.1998). But as to defendants' complaints regarding vendor payments, the FY 1997 closing process, and the evaluation and hiring of DAS staff, plaintiff has done just that.

For example, with respect to plaintiff's delay in preparing the FY 1997 closing packages, the facts set forth in defendants' statement of undisputed facts are largely unchallenged by plaintiff. (Def.St.¶¶ 18, 19, 21, 22, 23, 24, 25, 26, 29, 30, 31, 32, 33, 34, 35.)[9] Defendants contend that as part of the FY 1997 closing process, plaintiff was required to provide the Office of Finance and Operational Systems with audit and financial information and FY 1997 closing packages for DAS on or before November 30, 1997. (Def.St.¶ 23.) Defendants contend that plaintiff failed to meet the closing process due dates, as well as interim deadlines. (*Id.*)[10] Plaintiff attributes the delay to the fact that outside contractor support did not begin in October as she expected, but instead began in late November. (Pl. St. at 16–17.)[11] Not-

9. With respect to paragraph 32, plaintiff contends that she never received any warning, either orally or in writing, that she was in jeopardy of losing her job. (Pl. St. at 17.) Triggs testified that plaintiff was told in effect that "these things were serious and could not continue for the successful performance of [plaintiff's] job." (Def. St. at ¶ 32; Triggs Dep. at 83–84.) This arguable dispute, however, is not material given plaintiff's concession that Dong, Triggs, and Cabbell discussed with her their dissatisfaction with her performance. Even assuming that plaintiff was unaware that she was in danger of being terminated, that is not a basis for inferring discrimination. *See Smith*, 645 F.Supp. at 608 (" '[t]aking as true that appellant was unaware . . . of the dissatisfaction with his performance, . . . [is] no basis for an inference of discrimination' ") (citing and quoting *Pace v. Southern Railway System*, 701 F.2d 1383, 1391 n. 8 (11th Cir.), *cert. denied*, 464 U.S. 1018, 104 S.Ct. 549, 78 L.Ed.2d 724 (1983)). Plaintiff claims only to not have been told she was in danger of losing her job, not that she was unaware of defendants' dissatisfaction with her work.

10. It is undisputed that because certain DAS closing packages were needed by other agencies in order to complete their own closing packages, plaintiff's delay was having an adverse impact upon other client agencies. (Def.St.¶ 22.) Plaintiff has not disputed that Cabbell met with her in November 1997 and expressed his dissatisfaction with her progress with the FY 1997 closing packages and other issues. (Def.St.¶ 24.) Plaintiff does not dispute that when Loretta Braxton arrived at DAS to assist with the closing process, she found plaintiff's office in disarray and her staff untrained in the preparation of closing packages, and that she discovered that plaintiff's failure to submit timely and accurate FY 1997 DAS closing packages forced other District agencies to reopen their books and record budget deficiencies. (Def.St.¶ 25.) Nor has plaintiff taken issue with the Dec. 8, 1997 report from Bert Smith & Co., the outside contractors, to Cabbell that the DAS staff were not available for discussion in connection with the closing packages, or that they encountered a number of financial discrepancies in the DAS records. (Def.St.¶ 31.) It is also undisputed that Triggs and Dong met with plaintiff on December 9, 1997, and notified her of their serious concerns about her lack of progress with various projects, including the FY 1997 closing packages. (Def.St.¶ 32.) Plaintiff was given outside contractor support and was offered, and ultimately given, staff assistance from other CFO's and agencies to complete the closing process. Plaintiff does not dispute that no other agency-based CFO was either offered or received such assistance from their colleagues. (Def.St.¶ 24.) While other agency-based CFO's failed to meet deadlines for the submission of the FY 1997 closing packages, plaintiff also does not dispute that no other agency-based CFO required a comparably high level of staff and contractor assistance to complete the FY 1997 closing process. (Def.St.¶ 30.)

11. Plaintiff also alleges, citing the deposition of Cabbell, that the closing packages were never actually due by November 30, but in fact were always projected for the end of

withstanding the delay in outside contractor assistance, plaintiff has not disputed defendants' statements as to her own lack of progress prior to the contractors' arrival, refusals to accept offers of internal assistance, disarray in plaintiff's office, plaintiff's staff being untrained in the preparation of closing packages, and unavailability of staff to answer contractor questions once the outside team was in place. Her argument essentially is that she is not solely responsible for the delay. Even assuming this to be true, it does not establish that defendants' frustration with her contribution to the delay, or its impact on other agencies, is somehow false or pretextual.[12]

With respect to the dilatory payment of vendors, plaintiff does not dispute that her agency failed to pay some vendors in a timely fashion; that defendants received a number of complaints from vendors, the Mayor's Office and the D.C. Control Board regarding this delinquency; that some complaints from vendors accused plaintiff of unprofessional conduct; and that Dong repeatedly talked with her about the need to prioritize the timely payments of vendors. (Def.St.¶¶ 14, 15.) It is also undisputed that some vendors complained that DAS had not paid invoices that had been outstanding for many months and that as of October 1997, the OCFO continued to receive complaints from vendors about plaintiff's failure to make timely payments.

(Def.St.¶¶ 15, 17.)[13] In a meeting with plaintiff on December 9, 1997, Triggs and Dong notified her of their concern about her lack of progress with certain projects, including vendor payment issues. (Def.St.¶ 32.) And after plaintiff's termination, her replacement, Barbara Jumper, informed Dong that there was a sizable backlog of outstanding vendor invoices that had not been processed. (Def.St.¶ 39.)

Plaintiff contends that on certain occasions she refused to make what she believed were improper payments to certain vendors, and that while such decisions were controversial, she always made them in consultation with Mr. Williams and his staff.[14] (Pl. St. at 3.) Plaintiff also contends that every D.C. agency had some vendor payments that exceeded the normal 45-day period, and that she instituted a monitoring system at DAS which showed that most invoices were paid within 60 days. (Pl. St. at 7.) Even assuming that plaintiff contested or withheld certain vendor payments on what she believed were legitimate bases, that she consulted with Mr. Williams or his staff about these disputed payments, and that at some point during her tenure most vendor payments were being made within 60 days, this does not show that defendants' dissatisfaction with plaintiff on the issue of vendor payments was false or pretextual. Indeed,

December. (Pl. St. at 17.) Cabbell's deposition does not support this contention. Plaintiff also argues that the Coopers & Lybrand contract for outside closing support services states that the DAS closing package was to be delivered by December 1997. (Pl. Opp. at 13 and n. 4.) Plaintiff's Exhibit W, the Coopers & Lybrand proposal, does not contain such a statement. Plaintiff's Exhibit Y, a progress report prepared by Bert Smith & Co., who participated in the Coopers & Lybrand contract, lists the tasks remaining as of December 8, listed in order of priority "based upon original due date for submission to OFOS," with targeted completion dates of December 21, 1997. *Id.* at 2. This document does not state that the closing packages were originally due in December, but makes clear that there were original due dates (unspecified in this

document) which were not met, followed by targeted completion dates in December.

12. Plaintiff also contends that DAS received a clean audit opinion for 1997, and no management deficiencies were cited in the audit report with respect to plaintiff's management of DAS. Again, these facts are not responsive to defendants' complaints that plaintiff delayed and struggled in completing the closing process, they simply establish that ultimately the process was successfully completed.

13. The normal response time for the payment of vendor invoices was 45 days. (Def.St.¶ 15.)

14. Plaintiff does not contend that every late vendor payment was withheld on the basis of a dispute as to its propriety.

plaintiff's assertion that most payments were made within 60 days does not prove that most vendor payments were made on time, but rather it only supports the inference that most payments were not excessively late. The undisputed facts are that OCFO received repeated complaints about late vendor payments by DAS, that plaintiff was directed to prioritize the payments to outside vendors, and that the complaints continued. Whether plaintiff believes the complaints were justified is irrelevant, as the issue is whether defendants received the complaints and believed that plaintiff's performance was deficient. *See Vasilevsky,* 31 F.Supp.2d at 151 ("An employer is entitled to rely on his own perception of an employee's work performance."); *Smith,* 645 F.Supp. at 608 ("[P]laintiff's employers were entitled to rely on reports of plaintiff's performance given by his immediate supervisor . . . and by others familiar with his work."). Thus, there is no basis for arguing that this reason for plaintiff's termination was false or pretextual.

With respect to defendants' claim that plaintiff failed to build a strong team of employees at DAS, plaintiff's response is that high-level hires required approval from OCFO, and her four proposed applicants were not approved. It is undisputed that although plaintiff began work in February, she did not complete her required review and evaluation of the 15 staff members working in her office when she assumed her position until June (Pl. St. at 8, 9); that Antonio Acevedo, the former HR director at Mission Support, instructed plaintiff to submit documentation so that his department could begin recruiting qualified candidates for her, but that she was behind in doing so (Def. St. ¶ 9; Acevedo Dep. at 95–96); and that Triggs and

Dong reported to Williams that plaintiff was slow to build a strong team and that several key positions in her office, including her deputy, were not registered with Mission Support as of July 29 (Def. St. ¶ 13; Triggs Dep. Ex. A). These facts are not undercut by plaintiff's contentions that four proposed candidates were not accepted and that she did not receive a sufficient number of resumes for high-level positions. While plaintiff's argument that the failure to fully staff her office was not her fault may constitute a possible explanation for defendants' criticism of her job performance, it does not constitute evidence that defendants' reasons for her termination were either false or pretextual.

Whether plaintiff was solely responsible for the delays and deficiencies of which defendants complain, or whether she can explain or justify them, is not the issue. The issue is whether defendants' reasonably believed that plaintiff had performance difficulties in these areas and terminated her as a result. *See Gleklen v. Democratic Congressional Campaign Committee,* 199 F.3d 1365, 1369 (D.C.Cir. 2000) ("Whether the activity level actually increased is not the critical question. [Plaintiff] needed to—but did not—refute [defendant's] evidence showing that those in charge . . . reasonably believed that its activity would increase when they asked [plaintiff] to resume a full-time schedule and later terminated her for rejecting that request."). "Once the employer has articulated a non-discriminatory explanation for its action, . . . the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Fischbach,* 86 F.3d at 1183 (quotation marks and citation omitted).[15]

---

**15.** Moreover, not only has plaintiff failed to present evidence that defendants' reasons were "phony" reasons that defendants did not honestly believe, *Fischbach,* 86 F.3d at 1183, as to certain reasons, plaintiff has not even alleged facts to show that defendants were arguably wrong or unfair. With respect to plaintiff's failure to provide required reports

to her supervisors (Def.St.¶¶ 12, 16, 17, 20), plaintiff argues generally in her opposition that she kept Williams, Dong and Triggs updated on a frequent basis on the status of projects, problems, and issues (Pl. Opp. at 8), but she does not dispute the claim that she failed to submit required monthly progress reports and Financial Status Reports, or to

None of plaintiff's proffered explanations or criticisms of defendants' reasons can serve to cast doubt on the reasonableness of defendants' belief that plaintiff's performance was unsatisfactory. The record amply supports defendants' position that they terminated plaintiff because of their good faith belief, based on their observations and the criticisms received from third parties, which they documented and discussed with plaintiff, that she was not performing her job in an acceptable manner. The issue is not whether reasonable jurors might disagree with defendants' decision to terminate or might find some of the criticisms of plaintiff's performance to be overly harsh, but whether reasonable jurors could conclude that plaintiff's termination was motivated by a discriminatory animus. Such a conclusion cannot, as a matter of law, be permitted here, for although plaintiff takes issue with some of defendants' reasons, her evidence could not persuade a reasonable finder of fact that the reasons were not the real reasons, but instead, were a pretext for discrimination.

*Plaintiff's Other Evidence of Pretext and Discriminatory Intent*

In the absence of evidence from which a reasonable jury could find that defendants' reasons are false or pretextual, the Court must determine whether there is other evidence which would permit a jury to find that plaintiff sustained her burden of showing that defendants intentionally discriminated against her on account of her race.[16]

■ Plaintiff argues that certain statements made by Williams and Dong are evidence of both pretext and discriminatory intent with respect to her termination. A *Washington Post* article dated April 16, 2000, reports that Williams said, with respect to the stereotype that minority-run city governments do not operate well, "One of the legacies I want to leave is that one of the finest run cities in the country was run by an African American team, and that's an important message." Pl.Ex. P. Williams' statement is not evidence of discriminatory intent with respect to plaintiff's termination.[17] Moreover, it was made in the context of his statement that "we're committed to building a cadre of

respond to Triggs' requests for information. With respect to defendants' complaints regarding delay in submitting the FY 1999 DAS budget, plaintiff's arguments are simply not responsive. The facts related to defendants' claim that plaintiff did not timely submit the FY 1999 budget for DAS (Def.St.¶¶ 27–28) are not disputed. Plaintiff's response is that she devised a system to load the FY 1998 spending obligations of the agencies served by DAS onto an automated financial system, and these obligations served as a baseline for the agencies' projected FY.1999 spending. Thus, she argues the FY 1999 budget was distributed to these agencies by October or November of 1997. However, defendants' complaints relate to the preparation of the FY 1999 DAS budget, not the budgets of the DAS client agencies. Plaintiff's claim that she successfully balanced the FY 1997 DAS budget similarly is not responsive.

16. Plaintiff's argument that defendants' failure to articulate reasons for her termination in response to a letter from her counsel after her termination and prior to the filing of her EEOC complaint is evidence of pretext and

discriminatory intent is totally devoid of merit. It is undisputed that at the time of counsel's inquiry,· plaintiff had never made any formal or informal complaint to her supervisors that she believed she was the victim of unlawful racial discrimination. (Def.St.¶ 40.) Although plaintiff claims that no one ever told her she was in jeopardy of losing her job, it is undisputed that on numerous occasions her supervisors discussed with her their concerns about vendor payments, failure to complete reporting requirements, delays with respect to the FY 1999 budget submission, and delays with respect to the FY 1997 closing process. (Def.St.¶¶ 12,· 14, 15, 24, 27, 32.) The fact that these issues were not enumerated in response to a letter from plaintiff's counsel is not evidence from. which a jury could conclude that they are false or pretextual.

17. Similarly, the quote in the *Washington Post* article from an anonymous, white, former staffer that "[i]t was too white at the top in the beginning," referring to the mayor's inner circle at the beginning of his administration, has no bearing on plaintiff's termination from her CFO position while Williams was CFO.

talent, whether it's African Americans, Hispanic, or Asian Pacific.... We feel a special obligation to give them exposure and I don't shy away from that." *Id.* Williams' statement about his mayoral staff (not his CFO staff) and his commitment to diversity and challenging stereotypes, made more than two years after plaintiff's termination, provides no evidence of discrimination with respect to plaintiff's termination. *See Lutes v. Goldin,* 62 F.Supp.2d 118, 129–30 (D.D.C. 1999) (statements by defendant in speeches and newspaper articles regarding commitment to diversity do not show discriminatory motive with respect to plaintiff).

The statement also is not, as plaintiff argues, direct evidence of discriminatory intent. "[D]irect evidence does not include stray remarks in the workplace, particularly those made by non-decision makers or statements made by decision makers unrelated to the decisional process itself." *Kalekiristos v. CTF Hotel Management Corp.,* 958 F.Supp. 641, 665 (D.D.C.), *aff'd without op.,* 132 F.3d 1481 (D.C.Cir.1997) (citations omitted); *see also Beeck v. Federal Express Corp.,* 81 F.Supp.2d 48, 53 (D.D.C.2000). To be probative, remarks by the decision-maker must have some nexus to the adverse employment decision. *Kalekiristos,* 958 F.Supp. at 665. Williams' remarks had nothing to do with the decision to terminate plaintiff and do not belie a discriminatory approach to employment decisions generally. Therefore, the statement is not sufficient evidence on which a jury could base a finding of pretext or infer discriminatory motive with respect to her termination. Similarly, Dong's alleged statement to Antonio Acevedo that there were "too many white managers" in the District of Columbia (Def. St. ¶ 40; Acevedo Dep. 18–19) is not direct evidence of discriminatory intent, for the remark has no nexus to the decision to terminate plaintiff.[18]

Moreover, the Court finds persuasive the fact that the same group of management officials who fired plaintiff also hired her only a short time before, thereby raising a presumption or inference of non-discrimination. *See, e.g., Williams v. Vitro Servs. Corp.,* 144 F.3d 1438, 1441 (11th Cir.1998) (where same individual was responsible for hiring, promoting, and ultimately terminating plaintiff, "these facts may give rise to a permissible inference that no discriminatory animus motivated defendant's actions"); *Grady v. Affiliated Central, Inc.,* 130 F.3d 553, 560 (2nd Cir. 1997), *cert. denied,* 525 U.S. 936, 119 S.Ct. 349, 142 L.Ed.2d 288 (1998) (affirming summary judgment and noting that "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire," especially "when the firing has occurred only a short time after the hiring"); *EEOC v. Our Lady of the Resurrection Med. Center,* 77 F.3d 145, 152 (7th Cir.1996) (affirming summary judgment and finding presumption of non-discrimination where same manager hired and fired plaintiff within 10–month period); *Bradley v. Harcourt, Brace and Co.,* 104 F.3d 267, 270–71 (9th Cir.1996) (affirming summary judgment and finding "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive"); *Brown v. CSC Logic, Inc.,* 82 F.3d 651, 658 (5th Cir.1996) (affirming grant of summary judgment and adopting "same actor inference" where same individual hired and fired plaintiff over four-year period); *Evans v. Technologies Applications & Service Co.,* 80 F.3d 954, 959 (4th Cir.1996) (affirming summary judgment and noting "because Houseman

---

18. Acevedo testified that Williams was present when the remark was made. Acevedo Dep. at 18. He also testified that Dong did not tell Acevedo to do anything with respect to Dong's opinion that there were too many white managers. *Id.*

is the same person who hired Evans, there is a powerful inference that the failure to promote her was not motivated by discriminatory animus."); *Buhrmaster v. Overnite Transp. Co.*, 61 F.3d 461, 464 (6th Cir. 1995), *cert. denied,* 516 U.S. 1078, 116 S.Ct. 785, 133 L.Ed.2d 736 (1996) ("An individual who is willing to hire and promote a person of a certain class is unlikely to fire them simply because they are a member of that class. This general principle applies regardless of whether the class is age, race, sex, or some other protected classification."). The decision makers with respect to plaintiff's termination were Triggs, Dong, and Williams (Def.St.¶ 36), each of whom was involved in plaintiff's hiring.[19] The fact that the same individuals hired and terminated plaintiff within an eleven-month period further undercuts any allegation of discrimination.

In sum, plaintiff has not set forth sufficient evidence for a reasonable jury to conclude that defendants' proffered reasons for her termination are false or pretextual, or that her termination was the result of discrimination. Accordingly, summary judgment is awarded as to the discriminatory discharge claims in Count I.

## II. Disparate Treatment

Plaintiff also argues that other African American managers with performance difficulties were not terminated, and that African American managers received more

time, resources and support than she did. However, plaintiff has failed to provide any evidence that similarly situated African-Americans retained their positions while she was discharged for performance problems, or that they were provided with disparate time and resources. Plaintiff offers nothing more than generalizations and speculation, which are not sufficient to withstand a motion for summary judgment.

Plaintiff identifies six "black managers" whom she alleges were similarly situated and were treated more favorably than she: Stephanie Mitchell, CFO Department of Corrections; Darrell Wade, CFO Business Services and Economic Development; Abdusalam Omer, CFO of the D.C. Public Schools; Don Rickford, CFO of the University of the District of Columbia; and Delores Sheppard and Sam Fantasia, employees of the Department of Health Services.[20] (Pl. St. at 19–20.) Delores Sheppard and Sam Fantasia cannot serve as comparators, for plaintiff does not even identify their positions, other than to allege that they "both worked at the Department of Human Services." (Pl. St. at 20.) Without this information, their supposed retention is of no probative value.[21]

With respect to Mitchell, Wade, Omer, and Rickford, plaintiff has provided no evidence whatsoever to establish that any of these people were "similarly situat-

**19.** While plaintiff contends Dong was not present at her initial interview, it is undisputed that he extended the job offer to plaintiff. (Def.St.¶ 3.) In addition, the fact that Triggs is Caucasian (Def.St.¶ 2) suggests that she was not motivated by an anti-Caucasian animus in her recommendation that plaintiff be terminated.

**20.** In her opposition, plaintiff also argues that Valerie Holt, an African American woman who until recently was the CFO of the District of Columbia, failed to produce financial statements for the District for almost five months past the time they were due, but that Williams and Dong did not state she was unqualified or incompetent. However, Holt cannot be viewed as similarly situated, for she had a different position with different responsibili-

ties and she could only be removed from her position by the Control Board.

**21.** Plaintiff also contends that Saundra Manning, an otherwise unidentified "white manager" was allegedly terminated for performance issues. (Pl. St. at 19.) She cites and attaches, without any page reference, a 59 page report of the Committee on Government Operations on the Committee Investigation of Procurement Reform and the Independence of the Chief Procurement Officer, claiming that this report concluded that "the Deputy CFO was indeed doing her job in a professional manner." (*Id.*) However, without further specifics as to Manning or, at least, the citations to relevant portions of the report, the Court is unable to draw any parallels between plaintiff's situation and that of Manning.

ed" within the meaning of Title VII. To be considered " 'similarly situated,' the individuals with whom the plaintiff seeks to compare [ ]her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Phillips v. Holladay Property Servs., Inc.,* 937 F.Supp. 32, 37 (D.D.C.1996), *aff'd without op.,* 1997 WL 411695 (D.C.Cir. June 19, 1997) (citations omitted); *see also Holbrook v. Reno,* 196 F.3d 255, 261 (D.C.Cir.1999) ("A plaintiff must ... demonstrate that all of the relevant aspects of her employment situation were nearly identical to those" of the comparators) (citation omitted). Plaintiff alleges, without citing any factual support other than her own self-serving statement, that the agencies where these individuals served as CFO's had well publicized problems. *Cf. Vasilevsky,* 31 F.Supp.2d at 150 ("[P]laintiff's opinion of the relative merits of her credentials as opposed to those of selected individuals is irrelevant."). Moreover, plaintiff provides no evidence that these individuals were somehow responsible for the problems of their respective agencies, that they had individual performance problems, that they had performance problems similar to hers, or that they were treated more favorably than she was.[22] Plaintiff merely claims, without providing any evidentiary support, that Mitchell had "well-

publicized problems," that Wade "made little headway in addressing the financial problems at his agency," that under Omer "no progress was made at public schools," and that under Rickford's tenure, UDC "faced repeated budget crises which he was unable to resolve." (Pl. St. at 19–20.)[23]

Plaintiff also argues, without citation to any evidence, that of sixteen managers that comprised the CFO Council and its directors, six were Caucasian, nine were African American, and one was Hispanic. Plaintiff claims that of the nine African Americans, two resigned, two were promoted, four were retained and one was fired, of the six Caucasians, five were fired and one was demoted, and the Hispanic manager was fired. Defendants respond that the evidence shows that two of the Caucasian managers resigned voluntarily, that the Hispanic to whom plaintiff refers was the Human Resources Director and not an agency-based CFO, and that plaintiff has set forth no evidence to support her allegations regarding the racial makeup of the agency-based CFO's.

Defendants also set forth in their statement of undisputed facts the following statistics: "[d]uring [p]laintiff's tenure, Williams terminated 30 senior financial employees for inadequate performance, including CFO level employees. Of the CFO-level employees, only two were Caucasian, including plaintiff.[24] Two other

22. Indeed, plaintiff claims that Ms. Mitchell was ultimately terminated and that Mr. Wade was "reassigned to another responsible position within the OCFO," which is not identified as a demotion, a promotion, or a lateral move. (Pl. St. at 19.) Plaintiff herself was offered another position in lieu of termination, but did not accept such reassignment. (Def.St.¶ 37.) Even assuming these two persons were similarly situated, for which there is simply no evidence, plaintiff herself sets forth facts to show that they were treated the same.

23. Similarly, plaintiff's argument that her replacement by Barbara Jumper shows disparate treatment also fails. Citing two *Washing-*

*ton Post* articles, plaintiff claims that Ms. Jumper was either fired or asked to resign from her position as CFO of Metropolitan Police Department as a result of accounting irregularities and that she was ineffective in controlling the budget due to overtime abuses. (Pl. Opp. at 19; Pl.Ex. Q.) The documents plaintiff cites do not support the assertions she makes. Even if they did, these facts fall short of demonstrating that Jumper was similarly situated to plaintiff with respect to performance problems while employed at DAS.

24. It appears defendants are claiming that of the CFO-level employees terminated, two were white, as there were a total of four white

white CFO's … voluntarily resigned …" (Def.St.¶ 42.) Defendants' documentary evidence also shows that of the 30 employees, one was Hispanic, four were white, three were Asian, and twenty-two were black, including the CFO of Lottery (black), the Financial Officer of the Department of Employment Services (black), and the Financial Officer of the Office of the Chief Information Officer (black).[25]

It is unclear when plaintiff claims the CFO Council had the racial composition she alleges and when the employment actions she alleges are to have taken place, as her figures are inconsistent with defendants' with respect to both white and black CFO level employees. Even assuming plaintiff's figures to be correct, plaintiff sets forth no context for her allegations, no evidence regarding the reasons for the actions taken in each instance, and no evidence regarding the job performance of the various agency-based CFO's. Because plaintiff has not provided any information from which to determine whether any of these agency-based CFO's are similarly situated, and because this case is an *individual* disparate treatment case, the Court finds these alleged statistics are not a sufficient basis upon which to base a finding of pretext or an inference of discrimination. *See Lutes v. Goldin,* 62 F.Supp.2d 118, 128 (D.D.C.1999) (finding no basis to accord plaintiff's statistical analysis any significant weight where statistical data was not limited to similarly situated employees).

Plaintiff also contends that she suffered disparate treatment on the basis of her race in that she was routinely provided less time, resources, and support to carry out her responsibilities than was provided to her African–American counterparts. Again, plaintiff has not identified a single similarly situated African–American whom she alleges was more favorably treated with respect to time, resources, and support, nor does she cite any evidence that unidentified African–Americans were provided more time, resources or support.[26] Indeed, the record evidence, which is undisputed, shows that no other agency-based CFO was offered, or received, the same level of assistance in completing the FY 1997 closing packages as plaintiff. (Def.St.¶ 24.)

Plaintiff has simply set forth no evidence whatsoever that she received fewer resources than other non-white agency-based CFO's. Plaintiff has also failed to identify any similarly situated African American CFO who was treated more favorably than she was. Therefore, the Court will grant summary judgment as to the disparate treatment claims in Count I.

## CONCLUSION

For all of the above reasons, Defendants' Motion for Summary Judgment is granted. A separate order will accompany this opinion.

employees (including CFO-level) terminated, according to the document cited.

25. Of the twenty-two black employees terminated, two were terminated as part of a reduction in force, not for performance reasons.

26. Plaintiff claims that the DAS accounting unit had 11 employees in January 1998 and that immediately after her termination the staff was increased to 31 employees, suggesting that resources were withheld. (Pl. St. at 8.) There is no evidence that the staff was immediately increased to 31 employees. Plaintiff cites a document listing 31 employees of the "Office of Finance and Resource

Management," presumably within DAS as it lists Barbara Jumper as CFO, dated 10/14/99. Assuming that the DAS office had 31 employees more than 21 months after plaintiff's termination, this does not establish anything about the resources available to plaintiff as compared to other CFO's. Plaintiff cites no evidence whatsoever that shows the reason for the staff increases or that shows that greater resources were committed to the office after her termination, let alone that they were withheld from her during her tenure on the basis of her race. Plaintiff's argument amounts to sheer speculation.